Filed 4/6/18; Certified for publication 5/1/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ERIK J. HANSEN et al., | F073106 |
| Plaintiffs, Cross-defendants and Respondents, | (Super. Ct. No. VCU255788) |
| v. | |
| SANDRIDGE PARTNERS, L.P. et al., | **OPINION** |
| Defendants, Cross-complainants and Appellants. | |

APPEAL from a judgment of the Superior Court of Tulare County. Bret D. Hillman, Judge.

McCormick, Barstow, Sheppard, Wayte & Carruth and Scott M. Reddie for Defendant, Cross-complainant and Appellant Sandridge Partners L.P.

Cunningham & Treadwell, Cunningham, Treadwell & Bartelstone and David Bartelstone for Defendant, Cross-complainant and Appellant Citibank, N.A.

Gilmore Magness Leifer and David M. Gilmore for Plaintiffs, Cross-defendants and Respondents.

-ooOoo-

Respondent and cross-appellant Erik Hansen and several relatives (the "Hansens") own about 382 acres of farmland in Tulare County (APN 291-010-009; the "09 parcel"). Appellant and cross-respondent Sandridge Partners, L.P., (Sandridge) owns an adjacent parcel of about 250 acres (APN 291-010-005; the "05 parcel").[1] This case centers around approximately 10 acres on the southwest part of Sandridge's 05 parcel. The parties refer to this roughly triangular-shaped area as the "Disputed Land."

Hansen Ranches, a partnership between Erik and several relatives, has farmed the 09 parcel for as long as Erik can remember. For 30 years, Erik participated in the farming of the 09 parcel, and now he manages the day-to-day farming operations. When Erik began managing farming operations, there was already an irrigation ditch on the 09 parcel. The irrigation ditch generally runs along the border between the 09 and 05 parcels.[2]

Initially, the Hansens farmed mostly cotton, alfalfa, and wheat. The crops were planted on the entire 09 parcel *and* the Disputed Land. While a cotton crop was planted, there would be intermittent "activity" on the property for the entire year. However, "there could be weeks, maybe even months where no activity is seen." This absence of activity could occur after "ground prep" was finished, or while the Hansens were preparing to pre-irrigate, or while they were "waiting for rain or any of those kinds of things." However, the land would "have the appearance of being prepped for the

---

[1]    Citibank, N.A. (Citibank) is also an appellant and cross-respondent. Citibank's only apparent involvement is that it loaned $5,082,000 for Sandridge's purchase of the 05 parcel, secured with a deed of trust.

[2]    The Hansens' brief notes the ditch crosses the Disputed Land. In support, the brief cites a portion of Erik's deposition testimony. But Erik's testimony was that "all" of the ditch is on the "Hansen side" of the property and "runs along" the boundary between the 09 and 05 parcels. This testimony may have been imprecise, as it appears both parties acknowledge the ditch crosses the Disputed Land.

2.

planting." Specifically, it would "look like either cotton beds were in place with irrigation borders between checks and irrigation drainage ditch on the drainage side of the field."[3] Farming cotton involved the use of tractors, cotton planters, cultivators, "scouting," and "lots of different operations."

Sometimes the Hansens would rotate alfalfa or wheat with the cotton. While alfalfa was planted on the property, it would be visible to onlookers. Farming alfalfa often involved the presence of equipment including swathers, bailers, tractors, road graders, and border makers.

The Hansens' farming practices were "[m]ore or less consistent" over the years.

In 2002, the Hansens planted pistachio trees on part of the 09 parcel, to the north of the Disputed Land. In 2010, there was an internal discussion about planting pistachio trees on the remainder of the 09 parcel. In 2011, the Hansen family ordered pistachios trees for that purpose.

In early to mid-2011, Erik told his father he had learned that the owner of the neighboring 05 parcel, Valov[4], was in talks to sell it to Sandridge. At that point, Erik's father "remembered that there was a lot line adjustment issue." Erik's father "explained that there was a discrepancy in the line in what we have been farming" and that "we need to talk to [the] Valovs and make sure we straighten out the line before they close."[5] Erik's father did not explain why Hansen Ranches was farming on property they did not own. Erik's "assumption is that's just the way it was done . . . for the whole time."

---

[3] This sentence likely contains a reporter's transcription error.

[4] According to deeds in the record, title was actually held in the name of several trusts, but for convenience we will refer to the prior owners of the 05 parcel as "Valov" or "the Valovs."

[5] Prior to 2010, Erik did not know there was a dispute as to the ownership of the Disputed Land. Erik believed the Disputed Land belonged to the Hansen family.

Erik contacted Valov. Valov had a "vague recollection" of the lot line issue[6] but did not discuss specifics. Erik "asked him what stage of the game his deal is, and that we need to straighten out any discrepancies in the lot line before they close." Valov said he thought they would be able to resolve the issue before closing. Valov and Erik made arrangements to speak again later. However, Valov eventually stopped returning Erik's calls.

At some point "prior to planting [the pistachio trees] and prior to putting a drip system in" Erik spoke with Larry Richie, an employee of Sandridge. The "outcome" of the conversation "was that we would take care of this [lot line issue] some way, if it didn't get handled prior to closing through Valovs."

In the spring of 2012, the Hansens took several steps to prepare 160 acres of land—including the Disputed Land—for pistachio trees, including deep ripping the land and installing a drip irrigation system.[7] When the irrigation system was installed, Erik knew from his father "that a lot line adjustment needed to happen" but still claims he still did not know "the specifics" of the issue. Nonetheless, the Hansens planted the pistachio trees in June 2012.[8] Erik did not receive any complaints from any neighbors concerning the installation of the irrigation system or the planting of the pistachio trees.

Valov's sale to Sandridge closed in December 2012.

Erik finally spoke with Valov again after the sale closed. Erik said he wished they could have fixed the lot line issue before the close of the sale. Valov apologized, said his

---

[6]  The parties' briefs and Erik's testimony refer to the situation as a "lot line issue." Given that approximately 10 acres were involved, "lot line issue" is a bit of a euphemism, but we will use it to be consistent with the parties and testimony.

[7]  The Hansens also installed a filtration station "probably a month" before the June 2012 planting. Part of the filtration station was on the Disputed Land.

[8]  In appellate briefing, the Hansens indicate that the irrigation system was installed *after* the trees were planted. But Erik testified that he believed the irrigation system was installed in spring of 2012, and the trees were planted thereafter in June 2012.

4.

father was dying and "that he thought it might have created a problem for dealing with his dad's estate."

Sandridge, the Hansens, and their representatives negotiated to potentially resolve the Disputed Land issue. Those negotiations were unsuccessful, and the present litigation commenced.

The Hansens sued to quiet title to a "prescriptive easement for their continued use and occupation of the Subject Property." Under the prescriptive easement sought, Sandridge would have "no right to use or occupy any portion of the Subject Property." Sandridge cross-complained against the Hansens to quiet title and seek damages for conversion and trespass.

After a court trial, the superior court denied the Hansens' request for a prescriptive easement but instead granted the Hansens an "equitable interest . . . of limited scope and duration . . . with the following conditions:"

> "1) Hanson [*sic*] pay the full fair market value of the *unimproved* land to Defendant based on a valuation as of the date of trial. The *Hirshfield*[9] court ordered payment of full fair market value even though the interest granted was of limited scope and duration.

> "2) Hanson [*sic*] may not add to the encroachment, though they may repair the irrigation and filtration system and replace trees that die in the first five years after the initial planting in June 2012[.]

> "3) The interest will end should the Hansons [*sic*] stop farming the Disputed Property for a period of one year or more, or sell the Disputed Property.

> "4) The interest will terminate after the Pistachio trees currently planted are no longer a commercially viable crop. No testimony was offered by the parties on this issue so the court cannot set an exact duration of the easement."

---

9    *Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749 (*Hirshfield*).

**DISCUSSION**

## I.     The Hansens Are Not Entitled to an Equitable Easement

Appellants challenge the court's recognition of an equitable easement in favor of the Hansens.  We conclude that the Hansens' encroachment on Sandridge's land was negligent as a matter of law, and reverse the recognition of an equitable easement.

### A.  Law of Equitable Easements

"For a trial court to exercise its discretion to . . . grant an equitable easement, 'three factors must be present.  First, the [encroacher] must be innocent.  That is, his or her encroachment must not be willful or negligent.  The court should consider the parties' conduct to determine who is responsible for the dispute.  Second, unless the rights of the public would be harmed, the court should [stop the encroachment] if the [burdened landowner] "will suffer irreparable injury . . . regardless of the injury to [the encroacher]."  Third, the hardship to the [encroacher] from [ordering removal of the encroachment] ["]must be greatly disproportionate to the hardship caused plaintiff by the continuance of the encroachment and this fact must clearly appear in the evidence and must be proved by the defendant." '  [Citation.]  'Unless all three prerequisites are established, a court lacks the discretion to grant an equitable easement.' "  (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 1003–1004 (*Nellie Gail*).)

" 'Overarching the analysis is the principle that since the [encroacher] is the trespasser, he or she is the wrongdoer; therefore, "doubtful cases should be decided in favor of the plaintiff." '  [Citations.]  Moreover, 'courts approach the issuance of equitable easements with "[a]n abundance of caution." ' "  (*Nellie Gail,*, *supra*, 4 Cal.App.5th at p. 1004.)

### B.  Standard of Review

" 'We defer to the trial court's factual findings so long as they are supported by substantial evidence, and determine whether, under those facts, the court abused its

6.

discretion. If there is no evidence to support the court's findings, then an abuse of discretion has occurred.' " (*Nellie Gail, supra,* 4 Cal.App.5th at p. 1006.) While the resolution of factual *disputes* is left to the trial court, appellate courts may determine whether the elements of an equitable easement have been established by the facts as a matter of law. (E.g., *Shoen v. Zacarias* (2015) 237 Cal.App.4th 16, 21 (*Shoen*).)

## C. Application
### 1. *The Hansens Negligently Encroached on the 05 Parcel When They Planted the Pistachio Trees and Installed the Irrigation System*

The first requisite for an equitable easement is that the trespasser's encroachment " 'must not be willful or negligent.' " (*Nellie Gail, supra,* 4 Cal.App.5th at p. 1003; *Shoen, supra,* 237 Cal.App.4th at p. 19; *Tashakori v. Lakis* (2011) 196 Cal.App.4th 1003, 1009 (*Tashakori*).[10]) While all three elements of an equitable easement are necessary, this one is the most important. (*Hirshfield, supra,* 91 Cal.App.4th at p. 769 [encroaching party's innocence is "paramount"].) "If the [encroaching] party is willful, deliberate, or even negligent in his or her trespass, the court will enjoin the encroachment." (*Ibid.*)

Here, the trial court found the Hansens' "conduct in planting trees or constructing improvements was not an intentional or negligent encroachment."[11] As explained below,

---

[10]    Earlier cases stated this requirement differently: " '1. Defendant must be innocent—the encroachment must not be the result of defendant's willful act, and *perhaps* not the result of defendant's negligence.' " (*Linthicum v. Butterfield* (2009) 175 Cal.App.4th 259, 265, italics added (*Linthicum*), quoting *Christensen v. Tucker* (1952) 114 Cal.App.2d 554, 563 (*Christensen*).) More recent equitable easement cases have dropped the equivocal language concerning negligent encroachments. (*Nellie Gail, supra,* 4 Cal.App.5th at p. 1003; *Shoen, supra,* 237 Cal.App.4th at p. 19; *Tashakori, supra,* 196 Cal.App.4th at p. 1009.) We agree with the latter approach, and reject the Hansens' contentions that they may still be entitled to an equitable easement if their encroachment was negligent.

[11]    At one point, the Hansens appear to argue that the relevant encroachment is the 30 years of farming row or annual crops, rather than the 2012 planting/installation of the pistachio trees/irrigation system. But with respect to the balancing of hardships, the Hansens rely on the "disproportionate hardships" of having to remove the pistachio trees and reconfigure the irrigation system. Thus, it appears the Hansens want to use the 30 years of row or annual crops as the relevant encroachment for certain purposes but the pistachio trees/irrigation system as the

while there is evidence the Hansens' encroachment was not *intentional*, the evidence does not support the trial court's conclusion that the encroachment was not *negligent*.

In early or mid-2011, Erik's father "explained that there was a discrepancy in the line in what we have been farming." As a result, Erik "knew that . . . a lot line adjustment needed to happen," though he did not know "the specifics" of the issue. Nonetheless, the Hansens planted pistachio trees on 160 acres, including the Disputed Land.

Given that Erik knew there was a lot line issue at least by early/mid-2011, it strains credulity that he still did not know the "specifics" of the lot issue by the time the irrigation system was installed in the Spring of 2012. But, we must indulge every inference in favor of the judgment. Under that standard, Erik's claim he did not know the "specifics" of the lot line issue in 2012 supports the trial court's finding the Hansens did not knowingly and *intentionally* plant the pistachio trees on Sandridge's land.

However, even accepting Erik's version of events and the favorable inferences arising therefrom, we conclude it was undoubtedly *negligent* to plant trees on the land

---

relevant encroachment for other purposes. This mix-and-match approach does not work. Only the encroachment of the pistachio trees/irrigation system can conceivably satisfy the equitable easement requirement that "the hardship to the [encroacher] from [ordering removal of the encroachment] 'must be greatly disproportionate to the hardship caused plaintiff by the continuance of the encroachment.' " (*Nellie Gail*, *supra*, 4 Cal.App.5th at p. 1004.) Moreover, the pistachio trees and irrigation system are the encroachments considered by the trial court for purposes of determining whether an equitable easement should be recognized. Consequently, for purposes of analyzing the equitable easement, we consider the installation of the irrigation system and planting of pistachio trees to be the relevant encroachment.

The Hansens also identify relocation of the irrigation ditch as a potential hardship. But if this were the relevant encroachment, the Hansens would only be entitled to, at most, an easement for the irrigation ditch, not the land on which the pistachio trees were planted. That is not the property interest they sought in their complaint.

Granted, 30 years of farming could conceivably be the basis for a *prescriptive* easement. But the prescriptive easement sought here is improper for the reasons as explained in section II of the Discussion, *post*.

without first learning the location of a known, unspecified lot line issue. Indeed, if that conduct does not constitute a negligent encroachment, it is hard to imagine what would. While growers do not have a general duty to survey or otherwise confirm boundaries before planting, it is negligent to plant permanent crops on a swath of land, knowing that some unspecified part of that land is in need of a "lot line adjustment." Moreover, a contrary rule would encourage trespassers who are aware of an unspecified boundary issue to quickly build or plant something that is difficult to remove, rather than act responsibly and learn more about the issue. In equity, such willful ignorance should not be condoned, and certainly not rewarded.

The Hansens insist that " 'innocent' does not mean literally at no fault whatsoever." We agree. And if the Hansens had no reason to doubt they owned all of what they thought was the 09 parcel, it likely would not have been negligent to rely on factors like the purported lack of objection from Valov—or visual cues like the irrigation ditch. But by early to mid-2011, the Hansens *did* have reason to doubt their prior assumptions were wrong. Nonetheless, they planted the pistachio trees in the area *after* becoming aware that there was a lot line issue concerning the border between their parcel and Valov's.

The Hansens insist that Erik did not know the lot line issue involved the Disputed Land. That factor suggests the encroachment was not intentional, but it does not settle the issue of negligence. To the contrary, the fact that Erik did not know where the lot line adjustment was needed, is *precisely why* it was negligent to plant a permanent crop in the area without determining where the correct lot line was located.

In sum, the Hansens' encroachment fails to satisfy the first element of an equitable easement.[12]

---

[12] Because the absence of a single prerequisite precludes an equitable easement, we do not address the parties' contentions as to the other prerequisites. (See *Nellie Gail*, *supra*, 4

9.

### 2. *Sandridge Was Not Contributorily Negligent in Causing the Encroachment*

Some cases have suggested that an equitable easement may be permitted even where the encroaching party was negligent if the landowner was also negligent. (See *Linthicum, supra,* 175 Cal.App.4th at pp. 266–267; *Hirshfield*, *supra*, 91 Cal.App.4th at pp. 769–770; *Christensen, supra,* 114 Cal.App.2d at pp. 562–565.) We need not decide whether we agree with this principle because Sandridge was not negligent in any relevant sense. The trial court observed that Sandridge and Citibank "fault Hansen for failing to obtain a survey prior to commencing planting of their trees, but [Sandridge/Citibank] have not explained why they did not obtain a survey before closing escrow with the Valovs. [¶] Therefore, the Court is not going to fault the Hansens for failing to identify the exact location of the encroachment while exonerating Sandridge and Citibank for the same failure." But the question is whether and to what extent the parties were negligent *in causing the encroachment.* (See *Christensen*, at p. 564 [relevant negligence includes the encroacher's negligence in solely *causing* encroachment, and the landowner's negligence in *contributing* to it].) Here, the Hansens were negligent in encroaching on the Disputed Land by planting pistachio trees without confirming they owned the land in light of their knowledge that a lot line adjustment was needed. In contrast, Sandridge's "failure" to obtain a survey before the close of escrow has no causal relationship with the encroachment. Sandridge did not even own the land when the Hansens initiated the relevant encroachment and never acquiesced in the Hansens' uncompensated use of the Disputed Land. This is not a case where the landowner "observed" the construction of the encroachment "and acquiesced therein." (*Id.* at p. 558.) Because Sandridge was not negligent in any relevant sense, the concept of contributory negligence discussed in cases like *Christensen* and *Hirshfield* is not applicable.

Cal.App.5th at p. 1004 [" 'Unless all three prerequisites are established, a court lacks the discretion to grant an equitable easement.' "].)

Nor does Erik's conversation with Sandridge's employee, Ritchie, raise an inference of negligence by Sandridge. A vague representation that the parties would, together, "take care of this some way" in no way suggests that Sandridge was preemptively acquiescing to the Hansens' subsequent planting of pistachio trees and installation of an irrigation system on Sandridge's property. Moreover, the parties stipulated that "[a]ny use of the Disputed Land by [the Hansens] was done without the permission of Sandridge." In sum, Sandridge's conduct is not analogous to the *Christensen* landowner, who watched as the encroachment was built "and acquiesced therein." (*Christensen*, *supra*, 114 Cal.App.2d at p. 558.)

## II. The Hansens Are Not Entitled to the Prescriptive Easement They Seek

The Hansens cross-appeal with respect to the trial court's refusal to recognize a prescriptive easement. The trial court concluded that "the interest sought here isn't a prescriptive use culminating in an easement, but an adverse possession that seeks to effectively create a change in title." We agree with the trial court in this regard and reject the Hansens' challenge.

Interests in land can take several forms, including "estates" and "easements." (Civ. Code, §§ 701, 801.) An estate is an ownership interest in land that is, or may become, possessory. (4 Miller & Starr, Cal. Real Estate (4th ed. 2017) § 12:1.) In contrast, an easement is not a type of ownership, but rather an "incorporeal interest in land . . . ' "which confers a right upon the owner thereof to *some* profit, benefit, dominion, or lawful use out of or over the *estate* of another." ' " (*Guerra v. Packard* (1965) 236 Cal.App.2d 272, 285, italics added; see *Silacci v. Abramson* (1996) 45 Cal.App.4th 558, 564 (*Silacci*) [easement not an ownership interest].) An easement is, by definition, "*less* than the right of ownership." (*Mehdizadeh v. Mincer* (1996) 46 Cal.App.4th 1296, 1306 (*Mehdizadeh*).) Examples of easements include a right-of-way over another's land or the right to pasture on another's land. (Civ. Code, § 801.)

11.

Property interests like estates and easements can be acquired by (1) occupancy; (2) accession; (3) transfer; (4) will; or (5) succession. (Civ. Code, § 1000.) When title is acquired by occupancy, it is called title by "prescription." (Civ. Code, § 1007.) The process of acquiring an estate by prescription is called adverse possession. (See *Marriage v. Keener* (1994) 26 Cal.App.4th 186, 192.) An easement acquired by prescription, is called a prescriptive easement.

"There is a difference between a prescriptive use of land culminating in an easement (i.e., an incorporeal interest) and adverse possession which creates a change in title or ownership (i.e., a corporeal interest); the former deals with the *use* of land, the other with *possession*; although the elements of each are similar, the requirements of proof are materially different." (*Raab v. Casper* (1975) 51 Cal.App.3d 866, 876, italics added (*Raab*).)

"To establish the elements of a prescriptive easement, the claimant must prove use of the property, for the statutory period of five years, which use has been (1) open and notorious; (2) continuous and uninterrupted; (3) hostile to the true owner; and (4) under claim of right. [Citations.] To establish adverse possession, the claimant must prove: (1) possession under claim of right or color of title; (2) actual, open, and notorious occupation of the premises constituting reasonable notice to the true owner; (3) possession which is adverse and hostile to the true owner; (4) continuous possession for at least five years; and (5) payment of all taxes assessed against the property during the five-year period." (*Mehdizadeh, supra,* 46 Cal.App.4th at p. 1305.)

> "In no case shall adverse possession be considered established under the provision of any section of this code, unless it shall be shown that the land has been occupied and claimed for the period of five years continuously, *and the party or persons, their predecessors and grantors, have timely paid all state, county, or municipal taxes that have been levied and assessed upon the land for the period of five years during which the land has been occupied and claimed.*" (Code. Civ. Proc., § 325, subd.(b), italics added.)

12.

Conversely, a "prescriptive easement does not require payment of taxes."[13] (*Mehdizadeh*, *supra*, 46 Cal.App.4th at p. 1305.)

Because of the taxes element, it is more difficult to establish adverse possession than a prescriptive easement. The reason for the difference in relative difficulty is that a successful adverse possession claimant obtains ownership of the land (i.e., an estate), while a successful prescriptive easement claimant merely obtains the right to *use* the land in a particular way (i.e., an easement). (*Mehdizadeh, supra,* 46 Cal.App.4th at p. 1300.)

Unsurprisingly, claimants have often tried to obtain the fruits of adverse possession under the guise of a prescriptive easement to avoid having to satisfy the tax element. (*Kapner v. Meadowlark Ranch Assn* (2004) 116 Cal.App.4th 1182, 1187.) That is, they seek judgments "employing the nomenclature of easement but . . . creat[ing] the practical equivalent of an estate." (*Raab, supra,* 51 Cal.App.3d at p. 877.) Such judgments "pervert[] the classical distinction in real property law between ownership and use." (*Silacci, supra,* 45 Cal.App.4th at p. 564.) The law prevents this sophistry with the following rule: if the prescriptive interest sought by a claimant is so comprehensive as to supply the equivalent of an estate, the claimant must establish the elements of adverse possession, not those of a prescriptive easement. (*Raab,* at pp. 876–877.) In other words, the law simply "does not allow parties who have possessed land to ignore the statutory requirement for paying taxes by claiming a prescriptive easement." (*Kapner*, at p. 1187.)

To state the above rule is virtually to decide the Hansens' cross-appeal. In their complaint, the Hansens sought a "prescriptive easement" establishing their right to farm the property "*to the exclusion of Defendants* and all other persons" leaving "*Defendants . . . no right to use or occupy any portion*" of the Disputed Land (italics added). Though the Hansens labeled it a "prescriptive easement," the interest they sought would "divest

---

**13** Except "in the rare instance the easement has been separately assessed." (*Mehdizadeh*, *supra*, 46 Cal.App.4th at p. 1305.)

[Sandridge] of nearly all the rights that owners customarily have" including access and usage. (*Mehdizadeh*, *supra*, 46 Cal.App.4th at pp. 1305–1306; cf. *Raab*, *supra*, 51 Cal.App.3d at p. 876 [in determining whether a *conveyance* creates easement or estate, courts look to "the extent to which conveyance limits uses available to the grantor[,] an estate entitles the owner to exclusive occupation of a portion of the earth's surface"].) That is, Sandridge would not be able to use the Disputed Land for any "practical purpose." (*Harrison v. Welch* (2004) 116 Cal.App.4th 1084, 1094 (*Harrison*).) Because the interest sought by the Hansens was the *practical* equivalent of an estate, they were required to meet the requirements of adverse possession, including payment of taxes. (See *Mehdizadeh*, at pp. 1305–1308; *Silacci, supra,* 45 Cal.App.4th at p. 564 ["as a practical matter," easement completely prohibited true owner from using his land]; *Raab,* at pp. 876–877.) There is no dispute that element was not satisfied. Because the elements of adverse possession were not met, the Hansens cannot obtain the exclusive prescriptive easement they seek.

The Hansens counter that *all* easements involve "use of another's property that cannot be interfered with by the owner." But that does not mean that all easements are the practical equivalent of an estate. For example, consider an easement for a road across the property of another. The Hansens observe that such easements necessarily prevent the servient landowner from farming the property under the road, storing material in the roadway, or building a structure on the roadway. But the servient landowner would still be able to *drive* on the road.[14] Such nonexclusive easements do not create the same problem that arises when a purported easement prevents the servient tenement landowner from using the land for *any* "practical purpose." (*Harrison, supra,* 116 Cal.App.4th at p. 1094.)

---

[14]    Unless the easement excluded the landowner from driving on the road, in which case it *would* present the same type of concerns raised here.

## A. *Otay Water Dist. v. Beckwith* Does Not Alter Our Conclusion

The Hansens contend otherwise, arguing the present case is controlled by *Otay Water Dist. v. Beckwith* (1991) 1 Cal.App.4th 1041 (*Otay*).

In *Otay*, Kuebler Ranch conveyed certain real property to a water district. Kuebler Ranch inadvertently included in its grant to the water district three parcels it did not own. The water district subsequently built a reservoir, part of which was on the adjacent properties Kuebler Ranch had improperly purported to convey to the water district. The water district operated the reservoir continuously, beginning in 1963.

In 1972, Beckwith purchased 10 acres adjacent to the reservoir, which included 1.68 acres the water district thought it had acquired from Kuebler Ranch. The water district discovered the problem and sued to quiet title to a prescriptive easement against Beckwith and others in 1989.

The Court of Appeal upheld the water district's prescriptive easement. Beckwith had argued that "since an exclusive easement is tantamount to a fee estate, the only mechanism by which [the water district] could continue exclusive use would be to obtain a fee title" through adverse possession. (*Otay, supra,* 1 Cal.App.4th at p. 1048.) The *Otay* court acknowledged "that where an easement would create the practical equivalent of an estate, the party must satisfy the elements of an adverse possession, rather than a prescriptive easement." (*Ibid*.) But the court rejected Beckwith's premise that the water district's interest was equivalent to an estate, because the water district's use was restricted to "reservoir purposes." (*Ibid*.) "Such a restricted use is not the same as a fee interest." (*Ibid*.)

15.

We decline to follow *Otay*.**15**  While the water district's "easement" was restricted to "reservoir purposes," the interest was still the practical equivalent of an estate.  The water district got to use the land in the only way it wanted:  as a reservoir.  In contrast, the owner of the land, Beckwith, could not use the land at all.  As a result, the "easement" in *Otay* was the practical equivalent of an estate and should only have been permitted upon satisfaction of the elements of adverse possession.

### 1.  *Other Cases Cited by the Hansens Are Inapposite*

The Hansens also cite to cases involving *express* easements.  (E.g., *Pasadena v. California-Michigan Etc. Co.* (1941) 17 Cal.2d 576 (*Pasadena)*; *Gray v. McCormick* (2008) 167 Cal.App.4th 1019, 1031; *Blackmore v. Powell* (2007) 150 Cal.App.4th 1593; *Los Angeles v. Igna* (1962) 208 Cal.App.2d 338; *Ajax Magnolia One Corp. v. So. Cal. Edison Co.* (1959) 167 Cal.App.2d 743.)  But such cases are inapposite because express easements do not raise the same concerns as prescriptive exclusive easements.  Because the statutory tax requirement applies to prescriptive estates but not prescriptive easements, it is especially important to maintain the distinction between easements and estates *in the context of prescription*.  (See Code Civ. Proc., § 325, subd.(b).)  That is, if courts allowed claimants to obtain by prescription a functional estate without satisfying the statutory requirements of adverse possession, then Code of Civil Procedure section 325, subdivision (b)'s tax requirement would be nullified.  In contrast, that statute's tax requirement does not apply to express easements (e.g., easement by a written grant), so

---

**15**　　Several appellate opinions have stopped just short of expressly disagreeing with *Otay*. Instead, they "limit[]" *Otay* to situations involving public health or safety.  (*Mehdizadeh*, *supra*, 46 Cal.App.4th at p. 1307; *Silacci, supra,* 45 Cal.App.4th at p. 564.)

The Hansens object to limiting *Otay* to its facts, but at the same time insist that *Silacci* and its progeny should be limited to " 'garden variety residential boundary' disputes."  While the land use at issue here (i.e., agriculture) does not precisely match *Otay*, *Silacci* or *Mehdizadeh*, we do not find that fact dispositive in determining which cases are instructive.

16.

permitting *express* exclusive easements does not create the same statutory nullification issue that *prescriptive* exclusive easements do.

The Hansens also cite to *Hirshfield, supra,* 91 Cal.App.4th 749, but that was an equitable easement case, not a prescriptive easement case.**16** (*Id.* at pp. 769–771.)

Finally, the Hansens cite to cases involving prescriptive *non*exclusive easements. (*Warsaw v. Chicago Metallic Ceilings, Inc.* (1984) 35 Cal.3d 564; *MacDonald Properties, Inc. v. Bel-Air Country Club* (1977) 72 Cal.App.3d 693.) The Hansens argue the easement in *Warsaw* was exclusive "[o]*ther than the* [*landowner's*] *right to also drive on the . . . easement.*" (Italics added.) But that exception is crucial, because an easement is *non*exclusive if the servient landowner shares in the benefit of the easement. (Black's Law Dict. (9th ed. 2009) p. 586, col. 1.)

### 2. Conclusion

In sum, an interest in land that is functionally equivalent to ownership may be acquired by adverse possession, but not as a prescriptive easement. The elements of adverse possession were not satisfied here, and the trial court properly rejected the Hansens' claim.

---

**16**    *Hirshfield* does suggest in dictum that *Silacci* and *Mehdizadeh* "may be overbroad" because (1) prescriptive easements are determined by historical use and (2) exclusive easements exist. (*Hirshfield*, *supra*, 91 Cal.App.4th at p. 769, fn. 11.) But the fact that prescriptive easements and exclusive easements both exist separately does not aid in determining when, if ever, it is appropriate to grant easements that are *both* prescriptive *and* exclusive. *Hirshfield* relied on *Pasadena, supra,* 17 Cal.2d 576 and *O'Banion v. Borba* (1948) 32 Cal.2d 145 to support its criticism of *Silacci* and *Mehdizadeh*. But *Pasadena* concerned an *express* easement, and *O'Banion* involved a prescriptive *nonexclusive* easement. Neither case supports the suggestion that *Silacci* and *Mehdizadeh* were overbroad in their treatment of easements that are *both* prescriptive *and* exclusive.

17.

**DISPOSITION**

The judgment is reversed. The trial court is directed to enter judgment on the Hansens' complaint in favor of defendants Sandridge Partners, L.P. and Citibank, N.A. Said defendants shall recover costs on appeal.

_____
                                                            HILL, P.J.

WE CONCUR:


_____
SMITH, J.*


_____
MEEHAN, J.

---

\* Justice Gomes was part of the panel that heard oral argument in this matter. Unfortunately, he passed away on March 6, 2018. Justice Smith was assigned to this case in his stead. Justice Smith has reviewed the record in this case and has listened to the recording of the oral argument.

Filed 5/1/18

**<u>CERTIFIED FOR PUBLICATION</u>**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ERIK J. HANSEN et al.,<br><br>    Plaintiffs, Cross-defendants and<br>    Respondents,<br><br>        v.<br><br>SANDRIDGE PARTNERS, L.P. et al.,<br><br>    Defendants, Cross-complainants and<br>    Appellants. | F073106<br><br>(Tulare Super. Ct. No. VCU255788)<br><br><br>**ORDER DENYING REHEARING,<br>CERTIFYING OPINION FOR<br>PUBLICATION** |

**THE COURT:**

Respondents' petition for rehearing filed on April 23, 2018, in the above referenced case is hereby denied.

As the nonpublished opinion filed on April 6, 2018, in the above entitled matter hereby meets the standards for publication specified in the California Rules of Court, rule 8.1105(c), it is ordered that the opinion be certified for publication in the Official Reports.


                                                                                        HILL, P.J.

WE CONCUR:


SMITH, J.


MEEHAN, J.