Filed 5/5/26  P. v. Porter CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D084897 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE415694) |
| ROCHELLE RENE PORTER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Eugenia A. Eyherabide, Judge.  Affirmed.

Courtney Reed, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Kristen Ramirez, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

Rochelle Rene Porter appeals from her convictions for trespassing and violating court orders. On the trespassing count, Porter claims the trial court improperly instructed the jury that she had the burden to prove her prescriptive easement defense, and the charge was not supported by sufficient evidence. She further contends the prosecutor violated the Racial Justice Act (RJA) by discussing racial comments made by the victim.

Review of the alleged instructional error is barred under the invited error doctrine, and we reject Porter's associated claim that she received ineffective assistance of counsel concerning the jury instruction. Additionally, sufficient evidence supports that trespassing charge, and Porter has failed to establish an RJA violation. We therefore affirm the convictions.

# II. BACKGROUND

## A. *Procedural History*

Clinton Johnson owns a rental property in Spring Valley. Porter lives on an adjoining lot to the south of Clinton's[1] rental property. In June of 2022, Porter and Clinton got into an altercation on Clinton's rental property. On November 14, 2022, Clinton obtained a restraining order against Porter prohibiting her from coming within 50 yards of Clinton, his family, and Clinton's rental property. Porter returned to Clinton's rental property on at least two occasions.

Based on these incidents, the San Diego District Attorney's Office filed misdemeanor (case No. C420616) and felony (case No. SCE415694) charges against Porter. The trial court granted the People's motion to consolidate the two cases and dismiss several counts, resulting in the following charges

---

[1] We refer to Clinton and his wife, Griselda Johnson, by their first names for clarity. No disrespect is intended. (*In re Marriage of Olsen* (1994) 24 Cal.App.4th 1702, 1704, fn. 1.)

against Porter:  assault with a deadly weapon (Pen. Code,[2] § 245, subd, (a)(1); count 1), trespass and refusing to leave (§ 602, subd. (o)(1); count 2), and two counts of disobeying a court order, (§ 166, subd. (a)(4); counts 3–4).

B.    *Trial Proceedings*

Clinton testified at Porter's 2024 trial.  He told the jury that he has a "private driveway" on the west side of his rental property.  Using a satellite image of the neighborhood and photographs, Clinton identified the dividing line between his and Porter's property as being up a small hill and to the south of his driveway.  A fence sat on that property line, which had a gate leading to Porter's backyard.  Photographs depicted vegetation partially blocking the gate on Clinton's side of the fence, and Clinton testified that he was certain the gate had never been accessed since he purchased his rental property in 2009.

As for the altercation, Clinton testified that he was cleaning in his driveway when all of the sudden Porter was standing in front of him with a camera.  Clinton did not know Porter at that time, and she had parked her car in Clinton's driveway.  Porter stated she was taking pictures of trees but appeared to be taking pictures of Clinton, his truck, and his wife and children.

According to Clinton, Porter ignored his repeated requests that she leave, and she kept taking pictures.  Porter eventually retreated to her vehicle, grabbed a small metal bat, and then emerged from her car swinging the bat at Clinton.  Clinton did not remember exactly how, but he ended up with Porter's camera and a media badge she was wearing while trying to protect himself from the bat.

---

[2]    All further undesignated statutory references are to the Penal Code.

Clinton testified that he called the sheriff and told Porter he was going to give her camera to the sheriff. After Porter tried to get into Clinton's truck and Griselda intervened, Porter attacked Clinton with the bat a second time. Clinton eventually wrested the bat from Porter, and he suffered blunt force injuries to his arms and legs.

Griselda testified, stating that Clinton repeatedly told Porter that she was trespassing and that she needed to leave. Griselda explained that the incident occurred "[o]n my driveway. Right outside my garage." Griselda stated she was unaware of any easement that crossed the driveway.

The jury also heard from Adi Cebo, who lives next to Clinton's rental property. Referencing the neighborhood satellite image, Cebo identified Clinton's driveway as splitting off of, and distinct from, an easement over Cebo's property that provides access to homes behinds Cebo and Clinton's. Consistent with the satellite image, Cebo explained that Clinton's driveway was older and therefore had lighter colored asphalt than the road over the easement. Cebo testified that Porter does not need to use the easement road because her driveway exits to the street south of her house.

Cebo observed the altercation between Clinton and Porter. From his kitchen window, Cebo saw Porter taking pictures and approaching Clinton in Clinton's driveway. Clinton put his hands up attempting to stop Porter. Clinton then tried to hide behind his truck, and Porter followed him. Cebo told the jury that Porter retrieved a bat from her car and then assaulted Clinton with it.

Cebo recorded a portion of the incident with his phone. That footage was shown to the jury, which depicts Clinton and Porter standing in Clinton's driveway, Clinton demanding that Porter get off his property, and Clinton

4

and Porter tussling over a bat and leaf blower. The jury also saw body-worn camera footage from responding officers.

Porter testified in her own defense. Porter asserted that when she purchased her home approximately 40 years ago, the seller told her that the area where altercation occurred was an access road for her and her four neighbors. She denied it was Clinton's driveway, and claimed she and her neighbors used it as a road. Porter also said that for over 40 years, she has had access to the gate in the fence bordering her and Clinton's properties. She testified that she had been using that gate since she purchased her home in the 1980's, although she had not been using it for the past two years.

Regarding the June 2022 incident, Porter testified that she wanted to talk to Clinton about his trees that were damaging her property. Porter described Clinton as the aggressor, stating that he yelled at her and hit her in the chest as he snatched her media badge. Porter then retreated to her car and was planning to leave, but Clinton reached through her window, grabbed her camera, and tore her rotator cuff in the process. Porter demanded her camera back, and Clinton assaulted her six or seven times before she grabbed her flashlight and hit him with it. Porter suffered swelling and bruising.

The People admitted the deed to Porter's home, which described Porter's property as "Parcel 2" as well as "[a]n easement for road and utilities over the Southeasterly portion of Parcel 3 of Parcel Map No. 4247." Based on this deed, both Clinton and Porter testified that Porter's easement was on the southern part of Porter's property. They also both testified that Clinton's rental property was north of Porter's property.

In response to the deed, Porter's counsel requested that the trial court instruct the jury on prescriptive easements, asserting that the defense had the burden of proof on that issue. The trial court granted the request and

instructed the jury that "Porter must prove" the elements giving rise to a prescriptive easement. In closing argument, defense counsel reiterated that the prescriptive easement was a defense that Porter had to prove.

The jury was unable to reach a verdict on the assault charge, resulting in a mistrial on that count. The jury found Porter guilty of the remaining counts. The trial court granted Porter misdemeanor summary probation and ordered that she stay 100 yards away from Clinton and his rental property. Porter's timely appeal followed.

## III. DISCUSSION

### A. *Porter Did Not Receive Ineffective Assistance of Counsel Regarding the Prescriptive Easement Jury Instruction*

Porter argues that by instructing the jury that Porter had to prove the existence of a prescriptive easement, the trial court improperly shifted the burden of proof on the trespass charge. However, Porter's trial counsel invited the alleged error by requesting the challenged instruction. This typically bars appellate review. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 138 ["The doctrine of invited error bars a defendant from challenging a jury instruction given by the trial court when the defendant has requested the instruction based on a ' " ' "conscious and deliberate tactical choice." ' ' " ' "]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49 ["In cases involving an action affirmatively taken by defense counsel, we have found a clearly implied tactical purpose to be sufficient to invoke the invited error rule."].)

Nonetheless, Porter argues the request for the prescriptive easement instruction constituted ineffective assistance of counsel, so we will review the issue in that framework. To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation " 'fell below an objective standard of reasonableness under prevailing professional norms,' "

6

and (2) " 'resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.)  Finding no error in the challenged instruction, Porter is unable to establish either prong of ineffective assistance of counsel.

"In criminal cases, . . . the prosecution has the burden of proof beyond a reasonable doubt.  [Citation.] . . . But it is constitutionally permissible to place on the defendant the burden of proving affirmative defenses by a preponderance of the evidence, as long as the defendant is not required to negate an element of the offense." (*People v. Neidinger* (2006) 40 Cal.4th 67, 72.)  " '[A]n affirmative defense is one which presumes the prima facie elements of the crime are true, but exculpates the defendant because of excuse or justification.  [Citations.]  Stated another way, in this context an affirmative defense is one which does not negate any element of the crime, but is new matter which excuses or justifies conduct which would otherwise lead to criminal responsibility.' " (*People v. Spry* (1997) 58 Cal.App.4th 1345, 1369.)

As charged in this case, a person trespasses by "[r]efusing or failing to leave land . . . belonging to . . .  another and not open to the general public, upon being requested to leave by . . . the owner." (§ 602, subd. (*o*)(1).)

On the other hand, a prescriptive easement arises from the "open and notorious use of another's land, which use is continuous and uninterrupted for five years and adverse to the land's owner." (*Grant v. Ratliff* (2008) 164 Cal.App.4th 1304, 1308.)  Like other easements, a prescriptive easement "is not a type of ownership,"  but rather "the right to *use* the land in a particular way." (*Hansen v. Sandridge Partners, L.P.* (2018) 22 Cal.App.5th 1020, 1032, 1033.)

Here, a prescriptive easement would not negate that Clinton owned the driveway, that the driveway was not open to the public, or that Porter failed to leave after Clinton asked her to do so. Indeed, "continually trespassing on another's land" is what creates a prescriptive easement. (*Grant v. Ratliff, supra*, 164 Cal.App.4th at p. 1310.) Rather, the claimed easement was new matter that could excuse Porter's liability for trespass under section 602, subdivision (*o*)(1), despite that crime's elements being satisfied.

Accordingly, the prescriptive easement claim was an affirmative defense, and the trial court did not err in instructing the jury that Porter had the burden to prove it. Because the trial court did not err, Porter cannot show deficient performance by her trial counsel or resulting prejudice, and her ineffective assistance of counsel claim fails.

B.    *Sufficient Evidence Supports the Trespassing Conviction*

Porter challenges the evidence supporting the trespassing conviction. She claims there was insufficient evidence that she refused to leave because Clinton interrupted her attempted departure by taking her camera. Porter further asserts the evidence failed to show that she was on property lawfully occupied by another because she had a deeded easement over the area where the incident occurred. We disagree.

When a defendant challenges the sufficiency of the evidence supporting a conviction, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 780.) We do " ' "not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." ' " (*People v. Helzer* (2024)

8

15 Cal.5th 622, 646.) Unless it is clearly shown that " 'on no hypothesis whatever is there sufficient substantial evidence to support the verdict' " we will not reverse. (*People v. Zaun* (2016) 245 Cal.App.4th 1171, 1174.)

Clinton testified that the incident occurred in his "private driveway." Griselda testified similarly, telling the jury that Clinton owned the driveway, and she had no knowledge of an easement that crossed the driveway. Cebo also confirmed that the incident occurred in Clinton's driveway, which is separate from the easement that serves nearby houses.

The testimony from these three witnesses is consistent with the images and footage shown to the jury, which depict two distinct paths. First, there is a diagonal downhill road with newer and darker asphalt that passes Cebo's home and leads toward the homes behind Clinton's rental property. Second, there is a flat driveway with older lighter asphalt leading directly and exclusively to Clinton's rental property. These images and footage show the altercation occurring on the second path. Based on these visuals and the testimony from Clinton, Griselda, and Cebo, the jury could reasonably conclude that Clinton owned the driveway where the incident occurred and reject Porter's contradictory testimony that she had access to that area through a deeded or prescriptive easement.

Regarding the deed to Porter's home, the legal description indicates that Porter owns "Parcel 2" and "[a]n easement for road and utilities over the Southeasterly portion of Parcel 3 of Parcel Map No. 4247." As Porter acknowledges, "[t]here was no evidence presented as to which parcel belongs to [Clinton]," nor were any parcel maps admitted.[3] Without such evidence,

_____

[3] Porter cites an incomplete parcel map that was attached as an exhibit to the People's supplemental opposition to Porter's motion to continue trial. However, that map was never admitted into evidence, so we do not consider it in our substantial evidence review.

there is no way to determine where Parcel 2 and Parcel 3 are situated in relation to each other or whether Clinton owned Parcel 3. Accordingly, the deed merely proves that Porter had an easement. It does not prove where that easement was located.[4]

As for Porter's refusal to leave after requested, Clinton testified that Porter ignored his repeated requests to leave. Clinton explained that although Porter temporarily returned to her car, which was parked inside Clinton's driveway, Porter retrieved a metal bat and pursued Clinton with it, after which Clinton took Porter's camera while trying to protect himself. Griselda also testified that Clinton repeatedly told Porter she was trespassing and that she needed to leave. The jury also heard from Cebo that Porter approached Clinton in the driveway, Clinton put his hands up and tried to hide behind his truck, and Porter followed him. Finally, the jury also saw Cebo's cell phone footage, which captured Clinton requesting that Porter leave before the two tussled over the bat and leaf blower. From this evidence, the jury could reasonably conclude that Porter refused Clinton's requests that she leave, notwithstanding Porter's testimony that she was planning to leave until Clinton took her camera.

Based on the foregoing, the evidence sufficiently supported the trespassing charge.

C. *Porter Did Not Receive Ineffective Assistance of Counsel Regarding the Racial Justice Act*

1. Additional Background

When cross-examining Clinton, defense counsel asked him, "When the police asked you to describe Ms. Porter, you described her as 'She fits the MO

---

4    For these reasons, we do not consider Clinton and Porter's testimony interpreting the deeds to be substantial evidence.

of a crazy [B]lack lady'?"  The prosecutor asserted a hearsay objection and Clinton stated, "[t]hat's very racist," and "[s]he's trying to say that I'm racist."

After an unreported sidebar conference and recess, defense counsel resumed cross-examining Clinton:

> Q.  . . . You told police that Ms. Porter fits the typical MO of a crazy old black lady?  Yes or no?
>
> A.  I stated that she was crazy and that she was black, yes.  So, yes, I stated she was crazy, and, yes, I stated she was black.
>
> [¶] . . . [¶]
>
> Q.  You also told police that if Black Lives Matter was not on the news, that you would have used lethal force?
>
> A.  I believe -- I don't know if I said that to the sheriff that day.  I think that I said that in the preliminary hearing when questioned on why I did not retaliate with force.
>
> Q.  My question to you is:  did you say you would have used lethal force if Black Lives Matter was not on the news?
>
> A.  I said I think I could have used a higher degree of force, but I chose not to because I was considering that fact that was in the news at that time.

On redirect examination, the prosecutor questioned Clinton on this topic as follows:

> Q.  Was -- any interaction you had with Ms. Porter on the day she assaulted you, was any of it racially motivated?
>
> A.  Absolutely not.  Again, I'm a retired naval officer. I've never had any racial incidents in my career.  And stating that she's black and that she's crazy are facts.
>
> [¶] . . . [¶]
>
> Q.  So if she had been a crazy white lady, would you have described her in that fashion?
>
> A.  Anybody who would have acted in the manner that she acted, I would have described it as crazy, and any

11

other adjective or synonym to describe them that would be appropriate.

Q. When you made the comment about Black Lives Matter, you weren't allowed on cross to explain what you really meant by referencing Black Lives Matter. Can you explain that to the jury.

A. I believe this was around the time when -- like, I think, Minneapolis/St. Paul where I'm from Minnesota, was, like, on fire for these racially spurred topics. And it was in my mind of, like, hey, I need to, you know, be conscientious about how I handle this situation. Yeah, I mean, it's something, as a naval officer, you think about every situation like that; right. As a helicopter pilot, I analyzed risks and make decisions.

[¶] . . . [¶]

Q. So the way you conducted yourself when she came onto your property, would you have conducted yourself in the same manner if she had been white?

A. Yes.

Q. Would you have conducted yourself in the same manner if she had been Asian?

A. Yes.

In her closing argument, the prosecutor challenged the defense's attempt "to paint Clinton as a racist." The prosecutor acknowledged that Clinton made "an inappropriate comment" by referring to Porter as a "Crazy black lady," and that Clinton referenced Black Lives Matter and said he did not want to end up on the news. The prosecutor asserted that despite these statements, "it's just not fair that all of a sudden [Clinton's] this racist guy and this was a racially-motivated crime. That's not what this case is."

Defense counsel then argued in closing that Clinton "may have said something racist." Defense counsel therefore asserted that Clinton's testimony may have been influenced by bias or prejudice, and she was "just trying to show you the person that Mr. Clinton is."

12

2.    Porter's Argument

Porter argues the prosecutor violated the RJA by questioning Clinton about his racial comments and mentioning those comments in closing argument. Porter claims that by doing so, the prosecutor appealed to racial bias and encouraged the jury to consider Porter's race in its analysis of the case. We find no RJA violation.

3.    The RJA

A violation of the RJA occurs when, "[d]uring the defendant's trial, . . . an attorney in the case . . . used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful." (§ 745, subd. (a)(2).) However, there is an exception "if the person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (*Ibid.*)

" 'Racially discriminatory language' means language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin." (§ 745, subd. (h)(4).)

4.    Analysis

As several courts of appeal have now held, where a defendant could have raised an RJA claim at trial but failed to do so, the claim is forfeited. (See, e.g., *People v. Midell* (2025) 113 Cal.App.5th 1060, 1075–1076 [First Dist., Div. Two]; *People v. Corbi* (2024) 106 Cal.App.5th 25, 38–43 [Fourth

13

Dist., Div. One]; *People v. Singh* (2024) 103 Cal.App.5th 76, 112–116 [Fifth Dist.]; *People v. Lashon* (2024) 98 Cal.App.5th 804, 810–816 [First Dist., Div. Three].)  We agree with the reasoning of these cases and reject Porter's claim that they were wrongly decided.  We therefore find Porter's RJA claim forfeited because she could have raised it during trial.  We also decline Porter's request to exercise our discretion to disregard her forfeiture.  (See, e.g., *People v. Coleman* (2024) 98 Cal.App.5th 709, 720.)

Nonetheless, Porter claims infective assistance of counsel based on trial counsel's failure to assert an RJA claim.  We therefore reach the issue on that ground.

Porter's trial counsel was the first to introduce Clinton's racial comments.  Porter acknowledges her trial counsel had a valid basis for doing so because those comments impeached Clinton.  As the complaining witness, Clinton's credibility was important, and the prosecutor was permitted to respond.  (See, e.g., Evid. Code, § 774 ["A witness . . . may be reexamined as to any new matter upon which he has been examined by another party to the action."]; *People v. Thomas* (2021) 64 Cal.App.5th 924, 954 [prosecutors are permitted " ' "to fairly respond to arguments by defense counsel" ' "].)

When the prosecutor repeated Clinton's statements, she did not violate the RJA because she was "relating language used by another that is relevant to the case." (§ 745, subd. (a)(2).)  Further, in attempting to rehabilitate Clinton's credibility, the prosecutor sought to remove race from the case, as opposed to inviting jury to consider Porter's race in weighing the evidence. We therefore see nothing in the prosecutor's questions or argument indicating that she exhibited or appealed to racial bias.

Under these circumstances, Porter fails "to persuade us that had [her] counsel made a timely motion asserting that the People violated the RJA . . . ,

14

the motion would have been granted.  Thus, [she has] not established either the deficient performance or the resulting prejudice required to prevail on a claim of ineffective assistance of counsel." (*People v. Quintero* (2024) 107 Cal.App.5th 1060, 1078.)

## IV. DISPOSITION

The judgment is affirmed.


RUBIN, J.

WE CONCUR:


O'ROURKE, Acting P. J.


KELETY, J.

15