Filed 4/24/26  RMHP v. Bogdanoff CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| RMHP, LLC,<br><br>    Plaintiff, Cross-defendant and Respondent,<br><br>v.<br><br>JOHN BOGDANOFF et al.,<br><br>    Defendants, Cross-complainants and Appellants. | F089569<br><br>(Super. Ct. No. 21CECG01273)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Kristi Culver Kapetan, Judge.

John Bogdanoff and Manya Bogdanoff, in pro. per., for Defendants, Cross-complainants and Appellants.

LloydWinter and Jody L. Winter, Jennifer J. Panicker and Sean Fredin for Plaintiff, Cross-defendant and Respondent.

-ooOoo-

This appeal arises from a boundary dispute between the owners of two neighboring properties that were historically under common ownership. One property is the site of a mobile home and recreational vehicle (RV) park, and the other property is largely vacant land, with a mobile home on it.

Several structures and a fence belonging to the mobile home park encroach on the other property. In addition, an access road long used by residents of the mobile home park that crosses the other property was barricaded on the other property, leaving the mobile home park with only one point of ingress and egress, that is, its front entrance.

The mobile home park sued for quiet title to easements to accommodate its structures that encroached onto the other property and for use of the access road. The owners of the other property counter sued. After a bench trial, the trial court determined that the mobile home park had established entitlement to equitable easements for its encroaching structures and fence, as well as to an implied easement for use of the access road. The owners of the servient property appealed. We affirm.

## FACTUAL BACKGROUND

**The Relevant Properties**

The properties at issue in this case are located on the northwest corner of the junction of State Route 180 (Highway 180) and North Piedra Road (North Piedra Road or Piedra Road) in Sanger. In this area, Highway 180 (also known as E. Kings Canyon Road) runs in a roughly east-west direction and Piedra Road runs in a roughly southwest to northeast direction.

RMHP, LLC (RMHP) owns one of the relevant properties, 17604 E. Kings Canyon Road, which for decades has been the site of a mobile home and RV park.[1] The RMHP property is bordered to the south by Highway 180, to the east by the property of

---

[1] One of the witnesses at the underlying trial, Kevin Fry, testified he had lived in a mobile home at the park since 1989; the record further indicates the park was established in 1952.

the other party in this matter, and to the west by the Kings River.[2]  RMHP operates the mobile home and RV park under the name Riverbend RV Park.  RMHP itself is owned by Russell Martone.  We will refer to 17604 E. Kings Canyon Road as the Riverbend property, mobile home park, or park.

The other property, 83 North Piedra Road, is a smaller parcel situated adjacent to and east of the Riverbend property, alongside Piedra Road.  This property is owned by a married couple, John and Manya Bogdanoff (the Bogdanoffs).  We will refer to this property as the Piedra property or Bogdanoff property.

The Piedra property is approximately 3.67 acres and is zoned for agriculture, as pasture and meadow land.  It was much larger in the past, closer to 12 acres, when it was owned by the Bogdanoffs's predecessors in interest.  Before the Bogdanoffs bought the property, a substantial portion of it was acquired by Caltrans pursuant to eminent domain powers; Caltrans's acquisition of the property resulted in a lawsuit that was finalized in a 2017 judicial judgment.

As for the Riverbend property, it is at least 21.35 acres in area, possibly more.  The Riverbend property was also larger in the past, but before RMHP purchased it, a portion of it along Highway 180 was acquired by Caltrans as well.  Wildwood Creek, which connects to the Kings River, runs across both the Riverbend property and the Piedra property in a roughly east-west direction, for the most part.

**Historically, the Riverbend and Piedra Properties Were Under Common Ownership, but Owners Scott and Erin Aitchison Eventually Severed the Unified Property and Transferred the Constituent Properties to Different Entities**

Historically, the Riverbend and Piedra properties had been under common ownership (we refer to the Riverbend and Piedra properties collectively as the unified property).  As of 2004, the unified property was owned by Raul and Rosa Monroy.  The

---

[2]      It is unclear whether an unrelated property lies between the RMHP property and the Kings River.

3.

Monroys sold the unified property to Scott and Erin Aitchison on April 13, 2006. The Aitchisons, who operated the mobile home and RV park through a company called TRECDE 0610, LLC, transferred the unified property to their company in 2007.

On April 29, 2010, the Aitchisons sold the Riverbend property to another company, Riverbend MHP, LLC, owned and operated by Isabel Rodriguez, Orlando Rodriguez, and John Hankard. Isabel Rodriguez was a managing member of the LLC.

As for the Piedra property, the Aitchisons had secured a deed of trust for the property; when they defaulted on the secured obligation, Premier Valley Bank took title to the property on May 26, 2010. Thereafter, on October 27, 2010, the bank sold the Piedra property to Minh Tran. On September 6, 2013, Tran transferred the Piedra property to his wife, Nuong Vu.

**Bogdanoffs Managed the Mobile Home Park from 2014 to 2015; RMHP Bought Riverbend Property in 2017; and Bogdanoffs Bought Piedra Property in 2018**

On May 18, 2014, the Bogdanoffs appeared in the picture when John Bogdanoff entered into a lease and option to purchase agreement for the Riverbend property, with Riverbend MHP, LLC. Under the agreement, the Bogdanoffs operated the Riverbend property and made installment payments towards purchasing it. However, the Bogdanoffs eventually breached the agreement and, as of April 6, 2015, were prohibited from managing the park. Riverbend MHP, LLC again took over management of the park and initiated an unlawful detainer proceeding to evict the Bogdanoffs from the park. The Bogdanoffs were ultimately evicted from the park in August 2015.

On February 13, 2017, Riverbend MHP, LLC sold the Riverbend property to RMHP, which, as stated, is owned and operated by Russell Martone. Just over one year later, on March 16, 2018, the Bogdanoffs purchased the Piedra property from Nuong Vu, Minh Tran's wife.

**Format of Mobile Home Park Remained Unchanged Over the Years**

Russell Martone, the owner of RMHP, testified at the underlying bench trial that the park was regulated and licensed by the Department of Housing and Community Development (HCD).[3] The park's permit ran from September to September and was renewed by HCD every year. The permit specifies the number of mobile home and RV spaces the park is permitted to have. The park is permitted for 45 mobile home spaces and 29 RV spaces. A mobile home space can be used for an RV, but a mobile home cannot be installed in a space designated for an RV. HCD conducts periodic inspections to ensure the park remains in compliance with its permit, with no increase in the number of spaces for mobile homes or RVs. Changing the number of spaces encompassed by the park is a complicated process.

Since RMHP acquired the park, Martone has made extensive improvements, investing "about $3 million of [his] own money," but has not added spaces to the park. Martone testified in the underlying trial that the park "is in the same format as far as spaces as it was when I purchased the park." Similarly, John Bogdanoff testified that the Bogdanoffs did not make any changes to the format of the park when they operated it pursuant to the lease and purchase agreement with Riverbend MHP, LLC. Isabel Rodriguez, a managing member of Riverbend MHP, LLC, also testified she did not recall adding new spaces to the park when it was under Riverbend MHP, LLC's ownership.

As discussed further below, the trial court found, after the underlying bench trial in this matter, that ever since the Aitchisons had "purchased the [p]ark in 2006, it was operated as [a] mobile home park and a [RV] park, *in the same footprint as it is operated*

---

[3] When the Bogdanoffs managed the park pursuant to the lease agreement with Riverbend MHP, LLC, the park's permit was revoked by HCD.

*today*."**4**  (Italics added.)  The court further found:  "The mobile home and RV spaces have remained the same.  The use and maintenance of the park has not changed.  The [p]ark is home to senior citizens and low-income mobile home residents.  The [p]ark also rents spaces to owners of [RVs]."

**Access Road from the Park to Piedra Road Crossed the Piedra Property; Access Road Was Regularly Used by Park Residents but Was Eventually Barricaded on the Piedra Property**

When the Riverbend and Piedra properties were under common ownership, a dirt road was developed leading from the mobile home park's office on the Riverbend property to Piedra road; this road was known as the access road.  Kevin Fry, who had lived at the mobile home park since 1989, testified at trial that the access road was created in the year 2000, by park residents driving through the field between the Riverbend property and Piedra Road.  Fry added:  "And then [in the] early 2000s they brought a D3/D4 CAT in there and cut a flatter road."**5**  The access road crosses the Piedra property in a roughly east-west direction, just south of Wildwood Creek; it provided an ingress-and-egress point on the unified property's eastern boundary.  In contrast, the *main entrance* to the mobile home park for many years was directly on Highway 180, on the park's southern boundary.

In 2014, before the Bogdanoffs entered into the lease and purchase agreement for the Riverbend property, they were informed by their real estate agent about the use of the access road by park residents.  In addition, as park managers in 2014 and 2015, the Bogdanoffs were personally aware that residents of the park regularly used the access

---

**4**      The trial court's finding was based in part on RMHP's exhibits, including Plaintiff's Exhibits 76, 78, and 80.  Appellants, the Bogdanoffs, did not include these exhibits in the record on appeal.

**5**      Tran testified, at the underlying trial in this matter, that Scott Aitchison had fortified the access road when Aitchison owned both the Riverbend and Piedra properties, prior to selling the properties to Riverbend MHP, LLC and Tran, respectively.

road to enter and exit the park via Piedra Road.  The Bogdanoffs, who did not yet own the Piedra property, used the access road themselves as well.

Wilma Bryant, who, along with her husband, lived in the one mobile home on the Piedra property from 2009 to 2019, testified that residents of the mobile home park used the access road "[d]ay and night."

As for Martone, he testified that from the moment he first visited the park in December 2016, he saw park residents regularly using the access road.  He also used the access road on his first visit and continued to use it after RMHP bought the park in February 2017.  Martone had collected written statements from several park residents attesting that they all historically used the access road.[6]

As noted, prior to acquisition of the Riverbend property by RMHP and before the Bogdanoffs bought the Piedra property, Caltrans acquired portions of each property. Caltrans subsequently widened Highway 180 and closed off access to the mobile home park from Highway 180.  Instead, Caltrans built a new, paved, two-lane frontage road leading from *Piedra Road* to the park's main entrance (formerly accessed directly from Highway 180)  The new frontage road is situated a little north of Highway 180 and is "several hundred yards" south of the access road.  Upon completion of the frontage road in 2019, there were once again two ingress-and-egress points for the mobile home park, namely the main entrance via the frontage road and the access road.

---

[6]     Tran, the Bogdanoffs's predecessor-in-interest as to the Piedra property, testified at trial that for a one-year period, September 1, 2011, to August 31, 2012, he leased the *entire* Piedra property—which was 11.86 acres at that time—to Riverbend MHP, LLC. The lease referenced an " 'Access Drive,' " among other things.  The lease was *not* renewed after the one-year period that ended in August 2012.

When Martone bought the Riverbend property in 2017, he was not told about any such lease; nor did Minh Tran or his wife demand payment for the park's use of the access road.

Martone testified that in early 2018, his staff notified him that John Bogdanoff, along with Tran, had blocked off the access road. Fry, the park resident, also testified: "[John Bogdanoff and another man] took a tractor and they pulled like telephone poles and railroad ties to block the road off to where we couldn't drive through it anymore."[7]

Bogdanoff, for his part, testified that when he bought the Piedra property in March 2018, the access road was already barricaded. Wilma Bryant, who lived on the Piedra property around the time the Bogdanoffs bought it, testified that she, her husband, and her brother, had blocked it.

The park has an "emergency preparedness plan" as part of its operating permit, as required by HCD.[8] The plan was initially approved in 2011. The plan "shows an exit out the front of the park and it shows an exit between the office and the creek[, that is, the access road]." Martone testified that the plan reflects *two* ingress-and-egress points because "if one area is flooded, you've got an alternative … ingress/egress."

Martone testified: "That access road is actually defined in the emergency preparedness plan … [a]nd I'm concerned that I'm at risk because I'm not in compliance with my operating permit not having access to that access road." Martone added: "I'm afraid as soon as I submit something that eliminates that access road I'm going to be shown to be at risk or put my residents at risk." Martone emphasized: "I'm trying to get this resolved. I'm trying to get access to my access road that is part of my approved plan."

Martone noted the park had suffered a "severe flood" the previous year, when the main road into the park was flooded. He explained: "The access road elevation is higher

---

[7]     Fry testified that the area where the access road connected to Piedra Road was *not affected* by the changes made by Caltrans closer to the junction of Piedra Road and Highway 180 and remained fully accessible and usable.

[8]     RMHP admitted the emergency preparedness plan into evidence as Plaintiff's Exhibit 34; however, Exhibit 34 is not in the record on appeal.

than the rest of the park and there was no flooding on that access road." Martone continued: "I purchased the park based on the facilities that were there and available for my use[, including the access road]."

**Longstanding Encroachments from Riverbend Property onto Piedra Property**

When the Bogdanoffs entered into the lease and purchase agreement for the *Riverbend property* in 2014, they were specifically informed by their real estate agent (who also represented Riverbend MHP, LLC) that various structures on the Riverbend property encroached on the Piedra property. The Bogdanoffs were accorded the period of May 2, 2014, to June 2, 2014, to conduct due diligence in connection with the lease-and-purchase transaction. They did not request or require correction of any encroachments, although they made other requests.

Subsequently, when the Bogdanoffs bought the *Piedra property* from Nuong Vu in 2018, they did so with full notice and knowledge of many of the encroachments at issue in this litigation. They did not request or require Vu, the seller, to address or correct any of them.

**Martone Installed New "Green Fence" Along Southern Part of Common Boundary**

Martone testified that in early 2019, he wanted to install a fence along the southern boundary of the park and between the park and the Piedra property (partial boundary fence). Accordingly, starting in early 2019, he made efforts to contact John Bogdanoff to discuss the proper placement for the fence. Although the Bogdanoffs owned the Piedra property, they did not live there.

Martone knew the caretaker of the Piedra property, Adam Borshstetter, who was a "direct conduit[] for communication" with the Bogdanoffs.[9] Martone testified: "I had an individual that was renting space from me in the park on his own mobile home by the

---

[9] At the time, Borshstetter worked for the Bogdanoffs; he was also their friend. He had passed away by the time of trial.

name of Adam Borshstetter, who also had an agreement with Mr. Bogdanoff to go over and maintain his property.… [¶] So *for the whole year of 2019*, I continued to ask for Mr. Bogdanoff's contact information. I asked Adam if Mr. Bogdanoff did not feel comfortable in providing that to me, to give him my contact information and [for him] to contact me." (Italics added.) Martone added: "I wanted to get a fence installed that would separate the Riverbend property from the property at 83 Piedra, because I was trying to position my park for the upcoming RV camping [season]." Martone wanted to "cater to RV campers and not be known as a trailer park."

Martone testified that mid-April to mid-September is the high season for RV camping. Martone wanted to install the fence in advance of the high season, so the park would be separated from the relatively "unkempt" Piedra property. Martone also hoped the fence would "cut down on some of [the] road noise that [crossed] right into the RV campground [from Highway 180]."

Borshstetter eventually informed Martone that John Bogdanoff did not want Borshstetter to give Martone his contact information. Nor did John Bogdanoff contact Martone, despite Martone sending over his phone number. John Bogdanoff, in his own trial testimony, acknowledged that he did not allow release of his phone number to Martone.

Martone testified that after attempting to engage the Bogdanoffs for a full year, he finally told Borshstetter in February 2020 that he was "going to have to move forward with [the] fence." Martone explained: "So I contacted [Sam Renteria of] Sanger Fence and I had them come out, meet me at the property, and we walked the property. We looked at the front of the park, at the wells, and at the existing fence line. I told [Renteria] that I wanted to get a new fence installed as close to the property boundaries as possible, which I assumed were the existing fence line."

10.

However, Renteria testified that when he came to install the fence, a park employee showed him a property marker next to a huge oak tree.[10]  The marker was not perfectly aligned with the existing fence line.  Renteria had been installing fences for 20 years and knew what a property marker looks like:  "the markers normally have a solid steel rod that goes in the ground with a yellow head."  It was a survey stake with a cap.  He installed the fence six inches from the property marker, so "the concrete is not protruding on the other owner's property."

With regard to the *timing* of the fence installation, Martone testified:  "So after failed attempts to contact Mr. Bogdanoff to meet at the property for placement of the fence, I proceeded with having the poles of the fence installed [around February 20, 2020].  And it was only *after* that point that I received a call from Mr. Bogdanoff, and that's the first time I had any contact information for him, and that was February 26th, 2020."  (Italics added.)  Martone added:  "I missed his call and I immediately texted him back to let him know I was in the park and available to meet.  [¶] … [¶]  I went up to the front of the park and I actually met Mr. Bogdanoff for the first time."[11]

Martone testified:  "We looked at where the poles for the new fence that was going to be installed were placed and had a discussion during which Mr. Bogdanoff said he didn't believe that to be the correct location."  Martone continued:  "I asked him where he felt the correct location was, and he said he did not know.  He wanted to get some additional surveying information."  Martone conveyed to him that he urgently needed to install the fence, given the year-long delay.

---

[10]     Wilma Bryant confirmed there were property markers "over toward the park."

[11]     At the same time, *after* the fence poles were installed, John Bogdanoff sent a letter to Martone.  The letter was dated February 19, 2020, and demanded that Martone hold off on "further fencing construction" because Bogdanoff believed the common boundary was the "existing fence line."  (See below.)

RMHP admitted into evidence Martone's subsequent text messages with John Bogdanoff; however, the Bogdanoffs did not include the text thread in the record on appeal. (Plaintiff's Exhibit 75.) Martone described in his testimony some of his texts to John Bogdanoff. For example, Martone followed up with John Bogdanoff at the end of March, *a month* after their in-person discussion about fence placement. Martone inquired about the status of Bogdanoff's investigation and his projected timing in terms of getting back to Martone. Bogdanoff requested more time, into April, stating he needed another week.

Martone did not hear back, so he checked in again on April 14, April 15, and May 1, 2020. Martone sought to expedite the matter because "peak RV camping season" had arrived and he was anxious to complete the fence as part of his overhaul of the park and to visually separate his property from the Piedra property. John Bogdanoff, in his own testimony, conceded he did not promptly respond to Martone.

In the meantime, Renteria, the fence installer, informed Martone that should the completion of the fence be delayed past early May, Renteria would have to pull his crews away to other areas in the state for *his* busy season and did not know when he could return to complete the Riverbend job. Martone testified: "I held off pending survey information until [the] first part of May, and that's when I had the chain link and [green] privacy slats installed."[12] Martone had explained his situation to Bogdanoff through their text message thread.

**Bogdanoffs Commissioned a Survey of the Property Line in May 2020**

The Bogdanoffs hired Dale Mell, a licensed surveyor, who conducted a survey of the boundary between the Riverbend and Piedra properties. Mell also measured any Riverbend structures that crossed the common boundary and encroached on the Piedra

---

[12]     The parties refer to this fence as the "green fence," and so do we.

property.  Mell testified that his office was *first* contacted by Bogdanoff in May 2020.[13] Thus, it appears that notwithstanding the ongoing text communications between Martone and John Bogdanoff, the Bogdanoffs did not contact Mell until *after* Martone had installed the chain links and privacy slats to complete the green fence in early May, or at least around that time.

Bogdanoff then sent a letter to Martone dated May 18, 2020, advising that he had hired a licensed surveyor who had determined "the existing government lot lines and monuments."  In this letter, Bogdanoff advised Martone for the first time that the green fence, portions of several mobile homes, and a shipping container used for storage by the park, encroached on the Piedra property.  However, the letter did not include a survey map.  Martone did not receive a survey map depicting the common boundary and the encroachments, until June 2020.

Many of the encroachments documented in the survey had been disclosed to the Bogdanoffs in 2014, when they entered into the lease-and-purchase agreement for the park, with Riverbend MHP, LLC.

The results of the survey were accepted by RMHP in the trial court proceedings and for purposes of appeal.

**Mobile Homes 7, 8, and 9 Encroached on the Piedra Property**

The survey revealed that the mobile homes on spaces 7, 8, and 9 (mobile homes 7, 8, and 9), near the southern end of the park, encroached on the Piedra property.  Specifically, mobile home 7 encroached 7.8 feet, mobile home 8 encroached seven feet, and mobile home 9 encroached 0.5 feet or six inches.  The Bogdanoffs were specifically informed of these encroachments in 2014.  Furthermore, mobile home 9 did not belong to

---

[13]     Mell also clarified that his office had *no* issues or problems connected to the COVID pandemic.

the park; it was a tenant-owned home that the owner installed 30 years ago. The owner was ailing at the time of trial.[14]

**Shipping Container Used by Park for Storage Encroached on Piedra Property**

The survey also showed that one end of a shipping container used by the park for storage, located near the park's office, encroached 24.3 feet on the Piedra property. This encroachment was disclosed to the Bogdanoffs in 2014.

The shipping container is 40 feet long, eight feet wide, and eight feet tall, with metal doors. It is electrified by means of an underground wire and has both lighting and air conditioning. The storage container also has running water.

Martone testified: "The container is located right next to the RV [portion of the] park, and that's where we keep all of our smaller maintenance equipment and consumables that need to be secured." John Bogdanoff acknowledged that when he operated the park, he used the shipping container to store equipment, tools, and seasonal items.

Based on historical Google Earth Pro images, Martone determined that the shipping container had been in the same spot for 30-plus years. Martone stated: "I want to be able to continue to maintain and operate the park and its facilities as was the case when I purchased it."

**Mobile Homes 46 and 47 Encroached on Piedra Property**

In addition, the survey showed that the mobile homes in spaces 46 and 47 (mobile homes 46 and 47) were encroaching 45.2 feet and 23.9 feet, respectively, on the Piedra

---

[14]    Martone testified: "If for some reason I lost rights to that property, I would have to hire legal counsel to evict [the owner of mobile home 9] from the property and that would be his responsibility to move the home." Martone also testified that a couple rented mobile home 7, and the wife was in ill health; they had been there for 15 years or so. If Martone were ordered to remove mobile home 7, the couple would have to leave the park.

property, north of Wildwood Creek. This area forms a small, triangular part of the Piedra property, on the northeast, that is separated from the main parcel by Wildwood Creek.

Martone testified that upon purchasing the park, he began replacing mobile homes that were utterly dilapidated and beyond repair. All mobile homes "have a compacted pad that's equal to [at] minimum the perimeter of the home"; in some cases, Martone fortified the existing pads as well. The pads are "usually 3 or 4 inches higher than the surrounding areas so that you don't have water that flows in and sits under the homes." Spaces 46 and 47, and the pads in these spaces, were designed for mobile homes, with underground gas lines and gas meters, and water, electric, and sewer connections.[15]

When Martone purchased the park, space 46 contained "a larger RV [that] was built [up] with a permanent decking all around the home," and had "sheds that went all the way back up to the creek." Space 47 had a travel trailer in it. Martone cleared spaces 46 and 47 and bought, at significant cost, mobile homes to replace the prior structures. A mobile home was installed on the existing pad in space 47 and was "permitted" by HCD. With respect to space 46, Martone testified it was in place but not yet fully set: "I set 47, but by the time I got notification that I was encroaching, I held off on doing anything further with 46 until I got this resolved." Martone explained: "When I set up the homes, [HCD has] strict guidelines I've got to comply with."

Bogdanoff testified that mobile homes 46 and 47 were much bigger than the trailer homes that previously occupied those spaces. Bogdanoff filed a complaint with HCD with respect to the mobile homes in spaces 46 and 47, but HCD found the park was in compliance with its operating permit.

---

[15]     Asked to delineate the differences between mobile home spaces and RV spaces, Martone testified: "RV spaces will typically have your water, electric and sewer hookups. The mobile home spaces in addition to that also have the gas hookup with underground gas lines."

**Part of the New Green Fence Encroached on the Piedra Property**

Finally, Mell's survey showed that part of the new green fence—which started at the park's entrance near Highway 180, then ran along the park's southern boundary, then turned and extended northeast behind mobile homes 6, 7, 8, and 9—encroached on the Piedra property. The new green fence, which was only present in the southern reaches of the park, was an eight-foot-high chain link fence with green privacy slats. It was 481 feet in total length, with 430 feet extending alongside the Piedra property in a southwest to northeast direction. The 430-foot southwest-to-northeast segment of the green fence encroached on the Piedra property. The fence encroached by 25.5 feet at its southwestern end and 38.2 feet at its northeastern end.

Martone testified that he paid $30,000 to install the total length of the green fence (481 feet) in 2020; therefore, the cost to install the disputed stretch of the fence (approximately 430 feet) would have been roughly $26,000.

Renteria testified that should the court require moving the fence, the job would entail a week of work.

**Martone Consulted a Surveyor and Geometrics Engineer**

Martone, John Bogdanoff, and Fry all testified—and trial exhibits indicated—that the southern boundary area between the Riverbend and Piedra properties contained remnants of a preexisting fence that once formed a continuous boundary separating the two properties. Only a few bits and pieces of the preexisting fence remained. The evidence indicated the preexisting fence was made of different materials at various points along the common boundary (i.e., it was "mixed fencing").

In some areas, the preexisting fence was a *chain link* fence situated *west* of the green fence (that is, closer to the Riverbend property and the Kings River than the

green fence).[16] In other areas, the preexisting fence was a *barbed wire* fence situated on the other side or *east* of the green fence (that is, closer to the Piedra property and Piedra Road than the green fence ). The preexisting fence was not depicted on Mell's survey map.

After the present dispute arose, Martone consulted a licensed surveyor and geometrics engineer, Casey Lowry. Lowry testified at trial regarding his work for Martone. Lowry started by making a sketch of the survey conducted by Mell. He then located a segment of "the old existing fence that's about 20 feet long and has its own bearing already." Lowry testified: "So I wanted to put that on this [sketch] as it relates to everything else."

Lowry used a drone that was "coordinated on the state plan coordinate system" and a program called AutoCAD. He explained: "I projected the alignment of [the preexisting] fence up to the northeast and to the southwest … so we could see [the full] alignment of it [in the boundary area between the two properties]." Using controls on the ground, photos from the drone, and the AutoCAD program, Lowry projected on his sketch how the preexisting fence aligned with (1) the property line as shown on Mell's survey; (2) the offsets shown on Mell's survey; and (3) the green fence as shown on Mell's survey. Lowry's sketch was admitted into evidence as Plaintiff's Exhibit 81, but like most of RMHP's exhibits, Exhibit 81 is not in the record on appeal.

Lowry was asked: "So from a hypothetical standpoint, if you took the line that you shot and reflected on the map using the [pre]existing fence, would the encroachments that are listed on Dale Mell's map [of survey] be encroachments?" Lowry responded: "I didn't see any, no. As I projected [the line] along the old [pre]existing fence as shown on that sketch[,] projecting it to the northeast and to the southwest doesn't appear to have

---

[16] John Bogdanoff estimated, with respect to Defendants' Exhibit 107, that in one spot the preexisting fence and the green fence were "[m]aybe 10 feet" apart.

any encroachments." Lowry's work showed that, since the layout of the park was developed when the Riverbend and Piedra properties were historically unified, the preexisting fence rather than the actual property line, *became the recognized common boundary*. With the preexisting fence standing in for the true boundary, there were no obvious structural encroachments from the Riverbend property onto the Piedra property.[17]

While Mell's survey did not depict the preexisting fence line, Lowry's testimony clarified that the preexisting fence line was *east* of the actual property line, as it cleared the encroachments from the Riverbend property onto the Piedra property. As for the green fence, as noted above, it did not perfectly align with the preexisting fence line as it was a little east of the preexisting fence line (preexisting chain link fence) in one area, and a little west of the preexisting fence line (preexisting barbed wire fence) in another area. Since Lowry's sketch is not in the record on appeal, the *precise*, *relative* positions of the property line, the projected preexisting fence line, and the green fence, as delineated by Lowry, are unclear.

Lowry also testified that his projection showed that both the preexisting fence, as projected to the northeast, and the green fence ran into a large oak tree by the park's office, after intersecting a little south of that point. Lowry's testimony that the preexisting fence ran into the big oak tree helped explain why a property marker was situated at the oak tree; Renteria had relied on this property marker to install the green fence.

The park had long maintained and used the area encompassed by the preexisting chain link and barbed wire fences. John Bogdanoff testified that, when he managed the

---

[17] Martone testified that his staff had used lasers to project the alignment of the preexisting fence along the common boundary area of the Riverbend and Piedra properties, which projection indicated "there are no encroachments." Martone stated that Lowry's work "validates" his staff's findings.

park, he operated on the assumption that the preexisting fence line was the park boundary. Similarly, Martone said he too conflated the preexisting fence line with the property line. Martone added: "I relied upon that when I purchased the property, and that's what I based my significant investment in, to be able to operate the park based on facilities that had been operated in that manner for decades."

**Bogdanoffs Posted Signs Asserting Their Property Rights in Boundary Area**

After the property line survey by Mell was completed, the Bogdanoffs posted signs asserting their property rights (e.g., no trespass signs and use-only-by-permission signs) at various sites along the common boundary as clarified by the survey. The Bogdanoffs also taped off various areas along the common boundary. Martone thereafter initiated this lawsuit.

**Miscellaneous Facts**

The Bogdanoffs live in Cudahy and own multiple properties. Although they do not live at the Piedra property, they visit it often. The Piedra property has a mobile home on it; the Bogdanoffs bought the mobile home from the Bryants (who were renting the Piedra property) when they moved away in 2019. As for Martone, he does not live at the Riverbend property but directly manages it.

## PROCEDURAL HISTORY

On May 4, 2021, RMHP initiated the instant matter by filing, in the Fresno County Superior Court, a verified complaint for quiet title, injunctive relief, and damages. The complaint stated the Bogdanoffs had made claims regarding various park structures encroaching onto the Piedra property. The complaint further noted that the Bogdanoffs had "barricaded the access road" leading from the park to Piedra Road. The complaint stated: "The [a]ccess [r]oad has been used by the [park] employees, residents, guests, and the public to access Piedra Road for over 50 years, including school buses, postal workers, paramedics, police, and firemen." The complaint added: "[The Bogdanoffs] posted 'Right to Pass with Permission' … signs … throughout and dissecting the [park]."

19.

The complaint continued: "[The Bogdanoffs] installed lot line stakes and tape … throughout and dissecting the [park], claiming ownership, cordoning off and prohibiting use of portions of the [park]."

Among other claims, the complaint included causes of action for quiet title to an implied easement, equitable easement, easement by prescription, and/or easement by necessity, with respect to the access road and the other encroachments at issue. In the alternative, the complaint asserted causes of action for nuisance and trespass to land. The complaint also asserted a cause of action for a declaratory judgment to determine "the parties' respective rights and obligations in the [a]ccess [r]oad and [p]urported [e]ncroachments."

On August 30, 2021, the Bogdanoffs filed, along with an answer, a verified cross-complaint for ejectment, quiet title, injunction, declaratory relief, trespass, private nuisance, and damages for wrongful occupation of property. The cross-complaint asserted, among other things: "The Bogdanoffs provided RMHP, LLC notice of their encroachments and demanded that they cease them. [RMHP] failed to remedy these encroachments. The Bogdanoffs demanded, but [RMHP] refused to yield to the Bogdanoffs possession of the portions of the [Piedra] [p]roperty they occupied and failed and refused to vacate the [Piedra] [p]roperty and continue to hold it and withhold it from the Bogdanoffs."

The matter proceeded to trial on April 29, 2024. The trial court informed the parties at the beginning of trial that "it was going to bifurcate and have a court trial first because … the equitable issues predominate and affect any issues that would be decided by a jury in terms of damages or trespass or nuisance." The court explained it would make "the most sense in terms of judicial economy and for potential jurors[, for the court] to decide the equitable issues first outside the presence of the jury and bifurcate the case." Thereafter, the bifurcated bench trial on RMHP's claims for implied and/or equitable easements continued until May 7, 2024. RMHP's claims of trespass and nuisance were

20.

reserved for a jury trial potentially to be held at a later date, as were the Bogdanoffs's cross-claims for ejectment, trespass, nuisance, and damages for alleged wrongful occupation of property.

The primary witnesses who testified at trial were Russell Martone, John Bogdanoff, Isabel Rodriguez, Manya Bogdanoff, Minh Tran, and Kevin Fry (a longtime park resident). Dale Mell, the surveyor hired by the Bogdanoffs, and Casey Lowry, the surveyor hired by Martone, also briefly testified. In addition, Wilma Bryant, who lived with her husband in a mobile home on the Piedra property until 2019, testified. John Maxwell, RMHP's park manager, and Sam Renteria, who installed the disputed green fence for RMHP, also testified. Finally, AJ Burgin, a former park employee who was evicted from the park but instead allowed to stay on the Piedra property by the Bogdanoffs, testified as well. Numerous exhibits containing critical evidence were admitted into evidence by both parties and relied on by the trial court.[18]

## TRIAL COURT RULING

Following the bench trial, the trial court issued a statement of decision setting forth its decision and underlying reasoning. The trial court first delineated the issues for decision as follows: "On the complaint, the court is to decide if an easement or license (whether by prescription, implied, by necessity or in equity) has been created in favor of RMHP for the use of the 'access road' and the 'encroachments.' The cross-complaint seeks declaratory relief concerning whether the alleged encroachments are located on the [Piedra] property, and to quiet title by finding that no easement has been created for any encroachment. Cross-complainants also seek a mandatory and permanent injunction to remove any encroachments and to enjoin [RMHP] from entering any of [c]ross[-c]omplainants['] property. The 'encroachments' at issue are the 'green fence,' the mobile

---

[18] Appellants, the Bogdanoffs, have omitted most of RMHP's exhibits from the record on appeal.

21.

homes on spaces 46 and 47, the mobile homes at spaces 7, 8 and 9 and the shipping container."

With respect to the access road, the trial court determined: "RMHP has met its burden to establish an implied easement for continued use of the [a]ccess [r]oad." The court added: "[RMHP] has also established the existence of an equitable easement for continued use of the [a]ccess [r]oad as all of the elements for the establishment of such have been satisfied."

As for the green fence, the trial court concluded: "[RMHP] has established an equitable easement as to the placement of the [g]reen [f]ence."

Next, with regard to the mobile homes on spaces 46 and 47, the court ruled: "[RMHP] has established the existence of an equitable easement for the small portion of property that is burdened by the placement of the mobile homes."

With respect to the shipping container, the court found: "Similarly, there is an equitable easement for placement of the shipping container and the Bogdanoff[s] are not entitled to a mandatory injunction [requiring RMHP to move the shipping container]."

Finally, with regard to mobile homes 7, 8, and 9, the trial court stated: "The Bogdanoff[s] seek relocation of three occupied mobile homes. Space 7 encroaches seven feet onto the [Piedra] [p]roperty, Space 8 encroaches 7.8 feet onto the [Piedra] [p]roperty and Space 9 encroaches [0].5 feet onto the [Piedra] [p]roperty." The court determined: "[T]here is an implied and equitable easement for the *de minimus* loss of use of the property by the Bogdanoffs." The court declined to grant an injunction to the Bogdanoffs requiring RMHP to remove these three mobile homes.

The trial court concluded: "[RMHP] has met its burden to establish an easement for all of the alleged encroachments. As a result, [the Bogdanoffs's] claims to quiet title and seeking an injunction are moot."

Thereafter, on January 7, 2025, the trial court held a hearing to consider how to proceed with regard to any remaining issues. The court's minute order after the hearing

notes the parties had "stipulate[d] there [were] no further issues pending."  Accordingly, the court found "good cause to sign the [j]udgment."

## JUDGMENT

The judgment was signed and filed on January 8, 2025.  The judgment provided, in relevant part:

"After hearing sworn testimony, reviewing exhibits, and considering both parties['] closing briefs, the Court found that RMHP has met its burden of proof on all of its bifurcated causes of action set forth in the Complaint for quiet title to an easement by prescription, quiet title to an implied easement, quiet title to an easement by necessity, quiet title to an equitable easement, and irrevocable license under either a preponderance of evidence or by clear and convincing evidence standard.  Cross-Complainant[s] [have] failed to meet their burden of proof on any of their bifurcated causes of action set forth in the Cross-Complaint for declaratory relief, quiet title, and mandatory and permanent injunction under either a preponderance of evidence or by clear and convincing evidence standard.

"In conformity with the Court's Statement of Decision dated October 29, 2024, on the bifurcated equitable claims for quiet title, prescriptive easement, equitable easement, easement by necessity, irrevocable license, [and] implied easement ('Equitable Claims') the judgment set forth below is entered….

"THEREFORE, IT IS ADJUDGED, ORDERED, AND DECREED that:

"1.  RMHP owns in fee simple the real property situated in Fresno County, commonly known as 17604 East Kings Canyon Road, Sanger, California, 93657 ('Riverbend Mobile Home and RV Park Property') …. [¶] … [¶]

"2.  Defendants and Cross-Complainants JOHN BOGDANOFF, aka IAN BOGDANOFF, and MANYA BOGDANOFF own in fee simple the real property situated in Fresno County, commonly known as 83 North Piedra Road, Sanger, California, 93657 ('Bogdanoff Property') …. [¶] … [¶]

"3.  The Bogdanoff Property [i.e., the Piedra property] was, on May 4, 2021, the date of the commencement of this action, and now is

23.

subject to the following easements in favor of and running with the Riverbend Mobile Home and RV Park Property:

> "a. An implied easement for the continued use of the [a]ccess [r]oad from the Office located on the Riverbend Mobile Home and RV Park Property to North Piedra Road.
>
> "b. An equitable easement for the [g]reen [f]ence to remain where it was constructed and is currently erected.
>
> "c. An equitable easement for the portion of property burdened by the placement and existence of the mobile home spaces/pads 46 and 47.
>
> "d. An equitable easement for the placement and existence of the shipping container.
>
> "e. An implied and equitable easement for the portion of the property burdened by the placement and existence of the mobile home spaces/pads 7, 8, and 9."

RMHP served the Bogdanoffs with and filed a notice of entry of judgment on January 30, 2025. The Bogdanoffs's appeal followed.

## DISCUSSION

**I.**      **Preliminary Matters: RMHP's Request for Dismissal of Appeal Lacks Merit**

     *A.*      *The Appeal is Timely*

RMHP contends the Bogdanoffs's appeal is untimely under California Rules of Court,[19] rule 8.104 and must be dismissed. RMHP's argument lacks merit.

The judgment in this matter was entered on January 8, 2025. On January 30, 2025, RMHP filed a notice of entry of judgment in the trial court. RMHP's filing included a proof of service showing that the notice of entry of judgment was served on the Bogdanoffs on January 30, 2025. The Bogdanoffs filed a notice of appeal on March 26, 2025.

Rule 8.104, "Time to appeal," regarding civil appeals, provides in relevant part:

---

[19]      All further references to rules are to the California Rules of Court.

24.

"(a)  Normal time

"(1)  [Normally] a notice of appeal must be filed on or before the earliest of:

"(A)  60 days after the superior court clerk serves on the party filing the notice of appeal a document entitled 'Notice of Entry' of judgment or a filed-endorsed copy of the judgment, showing the date either was served;

"(B)  60 days after the party filing the notice of appeal serves or is served by a party with a document entitled 'Notice of Entry' of judgment or a filed-endorsed copy of the judgment, accompanied by proof of service; or

"(C)  180 days after entry of judgment."

Here, RMHP served the notice of entry of judgment on the Bogdanoffs on January 30, 2025.  The Bogdanoffs filed a notice of appeal 55 days later, on March 26, 2025.  Accordingly, the appeal is timely pursuant to rule 8.104(a)(1)(B).

RMHP contends the appeal is untimely under rule 8.104(a)(1)(A), because the judgment was served on the Bogdanoffs by the trial court clerk on January 8, 2025. RMHP is incorrect.  The proof of service cited by RMHP merely shows that the trial court's minute order from a hearing held on January 7, 2025, was served on the Bogdanoffs on January 8, 2025.  RMHP's contentions are not well taken.

### B.     The Parties' Briefs

RMHP contends the Bogdanoffs's opening brief fails to comply with rule 8.204 and contains the same deficiencies as an earlier brief submitted by the Bogdanoffs that was declined for filing by this court.  RMHP "requests that this Court decline to receive the re-filed brief and dismiss the appeal."  The two briefs submitted by the Bogdanoffs are not, however, identical and RMHP's bare assertion to the contrary is not well taken.

Although the Bogdanoffs's briefs are deficient in many respects—including not being properly organized, making conclusory and undeveloped arguments, not delineating all the relevant evidence, containing factual assertions that are not supported

by citations to the record, and containing factual assertions that are outside the trial record—we decline to dismiss the appeal.[20]

We note that the Bogdanoffs have not provided a complete record on appeal. The record on appeal in this matter does *not* contain all relevant trial exhibits, including most of RMHP's exhibits, that the trial court relied on in deciding the issues before it. "Appealed judgments and orders are presumed correct, and error must be affirmatively shown. [Citation.] Consequently, [the appellant] has the burden of providing an adequate record. [Citation.] Failure to provide an adequate record on an issue requires that issue be resolved against [the appellant]." (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502; see also *Osgood v. Landon* (2005) 127 Cal.App.4th 425, 435 ["It is the appellant's affirmative duty to show error by an adequate record."]; *Mountain Lion Coalition v. Fish & Game Com*. (1989) 214 Cal.App.3d 1043, 1051, fn. 9 [The appellant "has the burden of affirmatively demonstrating error by providing an adequate record. [Citations.] A necessary corollary to this rule is that if the record is inadequate for meaningful review, the appellant defaults and the decision of the trial court should be affirmed."].)

We further note that RMHP's *own* brief is very sparse. While there was a multiple-day trial (April 29, 2024–May 7, 2024) in this case, RMHP's brief neither discusses nor contains *any* citations to the evidence presented at trial. Indeed, RMHP's brief does not contain *a single citation* to the reporter's transcript of the trial. Citations to the clerk's transcript are merely to the trial court ruling that is being challenged on appeal. RMHP's brief contains minimal factual and legal analysis.

---

[20]    The Bogdanoffs were represented by counsel below but are self-represented on appeal.

**II.    Trial Court's Determination That RMHP Established an Equitable Easement for Placement of Green Fence Is Not an Abuse of Discretion**

The trial court ruled that RMHP had "established an equitable easement as to the placement of the [g]reen [f]ence." The Bogdanoffs challenge the court's determination on this issue. We affirm the court.

### A.    Trial Court's Ruling Regarding Placement of Green Fence

As noted, the trial court determined RMHP was entitled to an equitable easement for the green fence. The court first outlined the applicable law:

> "An equitable easement is found through the 'relative hardships' test and [a court may] grant an equitable easement 'where the hardship to the party seeking the easement is greatly disproportionate to the hardship caused to the servient owner .… The [c]ourt should consider whether the need for the easement is the result of the willful act of the party seeking the easement. The court should also consider whether the servient property owner will suffer an irreparable injury by the easement.' *Hinrichs v. Melton* (2017) 11 Cal.App.5th 516, 522[; see also] *Ranch at the Falls, LLC v. O'Neal* (2019) 38 Cal.App.5th 155, 183 (delineating the three requirements for creation of an equitable easement as: '(1) the trespass was innocent rather than willful or negligent[,] (2) the public or the property owner will not be irreparably injured by the easement, and (3) the hardship to the trespasser from having to cease the trespass is greatly disproportionate to the hardship caused [the owner] by the continuance of the encroachment.[)]' "

The trial court next analyzed the relevant evidence:

> "[RMHP] has established an equitable easement as to the placement of the [g]reen [f]ence. [RMHP] is indisputably an innocent party; it purchased the ongoing business enterprise and continued to operate, use and maintain it as it had been for many years. For decades [RMHP's] predecessors-in-interest relied on the 'preexisting fence' as the boundary of the [p]ark. Further, Mr. Martone attempted for well over a year to have Mr. Bogdanoff meet with him regarding the placement of the [g]reen [f]ence, in a spot satisfactory to both parties, to no avail. Ultimately, Mr. Martone was going to lose his contractor, who had begun the construction of the [g]reen [f]ence by setting the poles, due to the Bogdanoffs[']s refusal to meet with Mr. Martone. RMHP had a legitimate desire to have a fence erected to shield the [p]ark from the unkempt view of the Bogdanoffs'[s] property and noise from Highway 180. RMHP acted in

27.

good faith and the Bogdanoffs acted in bad faith. It was clear at trial that Mr. Bogdanoff intentionally avoided speaking to Mr. Martone and his agents regarding placement of the [g]reen [f]ence. Mr. Bogdanoff's testimony to the contrary was not credible. It is apparent that since purchasing the property adjacent to the mobile home park[,] the Bogdanoffs have intentionally interfered with its operation. They cannot now claim an encroachment."

"The Bogdanoffs cannot in good faith claim that they would suffer an irreparable injury if an easement is found to exist since the [p]ark has used the property encompassed by the fence for decades prior to the Bogdanoffs[']s purchase of the [Piedra] [p]roperty. The Bogdanoffs obviously knew of the existence of the [preexisting fence] as testified to by Mr. Fry and Mr. Martone. Further, the [g]reen [f]ence encroaches on only a small portion of the Bogdanoff[s]'s property that is not being used for any particular purpose. The hardship to [RMHP] if it had to incur the expense to move the fence greatly outweighs the burden of the slight encroachment."

## B.     Standard of Review

We review a trial court's decision whether to recognize an equitable easement under the abuse of discretion standard. (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 1005–1006 (*Nellie Gail*).) This standard "includes a substantial evidence component: 'We defer to the trial court's factual findings so long as they are supported by substantial evidence, and determine whether, under those facts, the court abused its discretion. If there is no evidence to support the court's findings, then an abuse of discretion has occurred.' " (*Id*. at p. 1006.)

In evaluating challenges to the trial court's factual findings, we consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment. (*Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1102.) If the evidence supports the finding, " 'no matter how slight it may appear in comparison with the contradictory evidence, the [finding] must be upheld.' " (*Keys v. Alta Bates Summit Medical Center* (2015) 235 Cal.App.4th 484, 488.) These rules apply to

28.

challenges to the factual findings contained in a statement of decision. (See *Brewer v. Murphy* (2008) 161 Cal.App.4th 928, 935; *Estate of Young* (2008) 160 Cal.App.4th 62, 75–76.) Under these principles, an appellate court " ' "must *presume* that the record contains evidence to support every finding of fact .…" ' [Citations.] It is the appellant's burden … to identify and establish deficiencies in the evidence. [Citation.] This burden is a 'daunting' one." (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.)

On legal questions, we apply a de novo review and exercise our independent judgment. (*San Bruno Committee for Economic Justice v. City of San Bruno* (2017) 15 Cal.App.5th 524, 529.)

### C.     *Legal Principles Governing Equitable Easements*

"In appropriate cases in which the requirements for traditional easements are not present, California courts have exercised their equity powers to fashion protective interests in land belonging to another, sometimes referring to such an interest as an 'equitable easement.' " (*Tashakori v. Lakis* (2011) 196 Cal.App.4th 1003, 1008 (*Tashakori*) [collecting cases].) " '[T]he courts are not limited to judicial passivity as in merely refusing to enjoin an encroachment. Instead, in a proper case, the courts may exercise their equity powers to affirmatively fashion an interest in the owner's land which will protect the encroacher's use.' " (*Id*. at p. 1009.)

"The 'relative hardship' test helps courts assess whether to deny injunctive relief to a property owner and instead grant an equitable easement to the encroaching user." (*Tashakori*, *supra*, 196 Cal.App.4th at p. 1009.) There are three requirements under this test, described in terms of the landowner and the trespasser. "Judicial creation of an easement over a landowner's property is permissible 'provided that the trespasser shows that (1) her trespass was " 'innocent' " rather than " 'willful or negligent,' " (2) the public or the property owner will not be " ' "irreparabl[y] injure[d]" ' " by the easement, and (3) the hardship to the trespasser from having to cease the trespass is " ' "greatly disproportionate to the hardship caused [the owner] by the continuance of the

encroachment." ' " ' " (*Ranch at the Falls LLC v. O'Neal*, *supra*, 38 Cal.App.5th at p. 183 (*Ranch*).)

" 'Unless all three elements are established, a court lacks the discretion to grant an equitable easement.' " (*Ranch*, *supra*, 38 Cal.App.5th at p. 183.)  This is true even if the court believes the imposition of an equitable easement is fair and equitable under all circumstances.  (*Shoen v. Zacarias* (2015) 237 Cal.App.4th 16, 20 (*Shoen*) ["the equitable nature of this doctrine does not give a court license to grant easements on the basis of 'whatever [a court] deems important,' even when these prerequisites are absent"].)  Thus, the court's focus must be on the three elements, rather than "a more open-ended and free-floating inquiry into which party will make better use of the encroached-upon land, which values it more, and which will derive a greater benefit from its use."  (*Id*. at p. 21.)  " 'Overarching the analysis' " is the importance of the legal owner's property rights and " 'the principle that since the [encroacher] is the trespasser, he or she is the wrongdoer; therefore, "doubtful cases should be decided in favor of the [property owner with legal title]." ' " (*Nellie Gail*, *supra*, 4 Cal.App.5th at p. 1004; accord *Shoen*, at pp. 20–21.)

We will review, for substantial evidence, the trial court's findings with respect to each element and consider whether, in light of those facts, its decision was an abuse of discretion.  (*Nellie Gail*, *supra*, 4 Cal.App.5th at p. 1005.)

### D.  First Element:  Trespass Must be Innocent

As noted, the first element requires the party seeking an equitable easement to prove the trespass was " 'innocent,' " rather than " 'willful or negligent.' " (*Nellie Gail*, *supra*, 4 Cal.App.5th at p. 1003.)  This factor " 'is the most important' " element for establishing an equitable easement.  (*Ranch*, *supra*, 38 Cal.App.5th at p. 184; *Hansen v. Sandridge Partners, L.P.* (2018) 22 Cal.App.5th 1020, 1028–1029 (*Hansen*).)

In assessing the equities under this element, " '[t]he court should consider the parties' conduct to determine who is responsible for the dispute.' " (*Tashakori*, *supra*, 196 Cal.App.4th at p. 1009.)  "The court must consider the conduct and intent not only of

the [trespasser], but also of the [land owner]." (*Linthicum v. Butterfield* (2009) 175 Cal.App.4th 259, 267; *Christensen v. Tucker* (1952) 114 Cal.App.2d 554, 563 ["[The trespasser] must be innocent—the encroachment must not be the result of [his or her] willful act, and perhaps not the result of [his or her] negligence. In this same connection[,] the court should weigh [the land owner's] conduct to ascertain if he is in any way responsible for the situation."]; *Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 769 ["The court may refuse to enjoin a negligent encroachment only if there is corresponding contributory negligence by the landowner."].)

With respect to the first element of the equitable easement analysis, the trial court found that RMHP was an "innocent party" that acted in "good faith" to install the green fence. The court pointed out that "[f]or decades [RMHP's] predecessors-in-interest relied on the 'preexisting fence' as the boundary of the [p]ark." However, that fence was largely gone with only a few segments remaining, whereby replacement made sense. In addition, RMHP had a "legitimate desire" for a new fence to "shield the [p]ark from the unkempt view of the Bogdanoffs'[s] property and noise from Highway 180."

Here, Martone appropriately reached out to John Bogdanoff to discuss the placement of a new fence. The trial court found: "It was clear at trial that Mr. Bogdanoff intentionally avoided speaking to Mr. Martone and his agents regarding placement of the [g]reen [f]ence." The court further noted: "Mr. Bogdanoff's testimony to the contrary was not credible. It is apparent that since purchasing the property adjacent to the mobile home park[,] the Bogdanoffs have intentionally interfered with its operation." The court found "the Bogdanoffs acted in bad faith." Ultimately, Martone was going to lose his contractor who had previously put in the fence poles, so the fence was completed.

We conclude the trial court's factual determinations are supported by substantial evidence. Since 2014, the Bogdanoffs had hoped to purchase the Riverbend property, along with the Piedra property. However, the Bogdanoffs's plans did not come to fruition. When the Bogdanoffs operated the mobile home park from 2014 to 2015, the

31.

park's operating permit was revoked.  Moreover, Riverbend MHP, LLC had to bring an unlawful detainer action to evict the Bogdanoffs from the residence they lived in as managers of the park.  The Bogdanoffs's difficult history with the Riverbend property appears to have been a factor in John Bogdanoff's dealings with Martone.  For example, evidence was presented that John Bogdanoff had a role in blocking the access road; he had filed complaints against the park with HCD; he would not talk to Martone about placement of the green fence despite his knowledge of the Riverbend property; and after he obtained Mell's survey, he posted multiple signs asserting his property rights throughout the boundary area of the two properties.

Martone testified that before he had the green fence installed, he tried for over a year to connect with John Bogdanoff to discuss appropriate fence placement.  Bogdanoff testified that he instructed Borshstetter not to share his contact information with Martone, and he did not respond to Martone's entreaties to contact him regarding a new fence.  It was only *after* the fence poles were installed that Bogdanoff met with Martone.

Thereafter, Bogdanoff wanted to hire a surveyor *himself*; he did not tell Martone to obtain a survey.  However, Bogdanoff then dragged his feet for another two months, notwithstanding that the poles for the fence had been installed and work was stopped pending information from him.  Bogdanoff testified he did not respond to Martone's status inquiries.  When Martone's fencing contractor told him he would not be available much longer *and* Bogdanoff did not respond to inquiries, Martone went ahead and completed the fence.  It was then that Bogdanoff hired a surveyor and identified encroachments, some of which he had known about since 2014.

Regarding the placement of the green fence, Martone testified he intended for the fence to align with the preexisting fence.  Ultimately, the green fence was aligned with a property marker in the boundary area that placed it in between the preexisting chain link fence and the preexisting barbed wire fence to the south.  While the evidence regarding the different segments of preexisting fence and their relationship is confusing, the green

fence basically splits the difference. Furthermore, Lowry testified that the green fence aligned with the preexisting fence as projected by him, south of the big oak tree in the vicinity of the property marker. Since Lowry's sketch is not in the record on appeal, we cannot turn to it for further clarity.

Given that various park structures encroached on the Piedra property in this area, Martone reasonably believed the preexisting fence that cleared all the structures was the property line. The Bogdanoffs identify no evidence that prior to the survey Martone was aware that the structures in this area were encroaching in the first place. It appears Martone made a good faith effort to align the green fence with the preexisting chain link and preexisting barbed wire fences, as well as the property marker located by his employee.[21] Moreover, given the presence of preexisting encroaching structures in the area, it would likely not be possible to place a continuous fence directly on the property line.

We conclude the trial court's determination that Martone was an innocent trespasser is supported by substantial evidence, and its related discretionary determinations do not represent an abuse of discretion. (See *Linthicum v. Butterfield*, *supra*, 175 Cal.App.4th at p. 267 ["The question whether the [trespasser's] conduct is so egregious as to be willful or whether the quantum of the [trespasser's] negligence is so great as to justify an injunction is a matter best left to the sound discretion of the trial court."]; *Christensen v. Tucker*, *supra*, 114 Cal.App.2d at p. 564 ["where [the landowner's] conduct also contributes to the situation, then the trier of the fact is entitled to weigh the hardships each may suffer, and the negligence of one against the other"].)

---

**21** There is no evidence in the record on appeal regarding the precise position of the preexisting fences relative to the property line.

The Bogdanoffs cite *Hansen*, *supra*, 22 Cal.App.5th 1020, in support of their argument that RMHP was not an innocent party. In *Hansen*, the trespassing party was a farming partnership whose managing partner was aware that an area of land in which the partnership planted pistachio trees was subject to a "lot line" dispute with the neighboring property owner. (*Hansen*, *supra*, 22 Cal.App.5th at pp. 1025–1026.) This partner "knew … 'that a lot line adjustment needed to happen,' " but nonetheless planted trees on the neighbor's property. (*Id*. at pp. 1026, 1029.) The *Hansen* court found this knowledge reflected negligence with respect to the encroachment, reasoning: "*While growers do not have a general duty to survey or otherwise confirm boundaries before planting*, it is negligent to plant permanent crops on a swath of land, *knowing* that some unspecified part of that land is in need of a 'lot line adjustment.' " (*Id*. at p. 1030, italics added.) In so concluding, the court agreed with the farming partnership that it is not necessarily negligent to determine boundaries based on "visual cues" on the property or on a neighbor's lack of an objection, but the court found that during the relevant time, the partnership "*did* have reason to doubt [its] prior assumptions .… [The partnership] planted the pistachio trees in the area *after* becoming aware that there was a lot line issue concerning the border between their parcel and [the neighbor's property]." (*Ibid*.)

Here, in contrast to *Hansen*, the Bogdanoffs have not identified any evidence that RMHP *knew* the preexisting fence and property markers in the boundary area did not mark the property line. Moreover, as mentioned, Bogdanoff did not respond to Martone's overtures about the placement of the new fence for over a year, indicating an apparent lack of objection. (See *Hansen*, *supra*, 22 Cal.App.5th at p. 1030 [in the absence of the partnership's knowledge that lot line adjustment was needed, it likely would not have been negligent to rely on factors like evident lack of objection from the neighbor].) While Bogdanoff contacted Martone after the fence poles had already been installed and agreed to provide more information, Bogdanoff thereafter again stopped responding to Martone. Therefore, *Hansen* is distinguishable.

### E. Second Element:  Irreparable Harm

On the second equitable easement element, the party claiming the easement must prove the other property owner (here, the Bogdanoffs) would not suffer irreparable harm. (*Shoen*, *supra*, 237 Cal.App.4th at p. 19.)

As to this element, the trial court found, as an initial matter, that the Bogdanoffs already did not use the land that was encompassed by the preexisting fence.  Rather, the mobile home park had used that stretch of property "for decades prior to the Bogdanoffs['s] purchase of the [Piedra property]."  The court pointed out the Bogdanoffs were well aware of the existence of the preexisting fence, even before they bought the Piedra property.  The court noted:  "Further, the [g]reen [f]ence encroaches on only a small portion of the Bogdanoff[s]'s property that is not being used for any particular purpose."  The court determined that in these circumstances, "[t]he Bogdanoffs cannot in good faith claim that they would suffer an irreparable injury if an easement is found to exist."

We conclude the trial court's findings are supported by substantial evidence. There is no question the Bogdanoffs are harmed by losing exclusive use of their property. However, the Bogdanoffs provide no authority that a court is required to find the property owner suffers irreparable harm merely from the loss of use of the property.  Furthermore, here much of the relevant area has been used by the park for decades, including when the park was managed by the Bogdanoffs themselves.  In addition, the relevant area of the Piedra property is a vacant strip that is relatively far from the mobile home situated on the Piedra property; the mobile home is to the northeast of the green fence, in the vicinity of Wildwood Creek.  Finally, the Bogdanoffs did not posit any anticipated plans or uses for this stretch of the Piedra property.

### F. Third Element:  Balancing of Harms

On the third element of equitable easement, the party claiming the easement must show the hardships or conveniences "tip disproportionately in favor of the trespasser."

35.

(*Shoen*, *supra*, 237 Cal.App.4th at p. 20.) On this element, the court must start with the presumption that the property owners will be harmed because of their "substantial interest in [the] exclusive use of [the] property arising solely from [their] ownership of [the] land." (*Ibid*.) Thus, the party seeking to establish the easement must "prove that she will suffer a *greatly disproportionate* hardship from denial of the easement than the presumptively heavy hardship the owner will suffer from its grant." (*Ibid*.)

Here, the trial court noted that "RMHP had a legitimate desire to have a fence erected to shield the [p]ark from the unkempt view of the Bogdanoffs'[s] property and noise from Highway 180." The court also considered the fact that the installation of the fence was considerably delayed, noting that RMHP "attempted for well over a year to have Mr. Bogdanoff meet with him regarding the placement of the [g]reen [f]ence." Further, the record discloses that RMHP spent approximately $26,000 to install the disputed section of the fence in 2020 and the court considered that moving the fence would result in additional expense. On the other hand, aside from the Bogdanoffs's strong interest in the exclusive use of their property, the court considered the fact that the Bogdanoffs were long aware that the disputed area was partly encompassed by the preexisting fence and that this area had for decades been used by the park. The court also considered that "the [g]reen [f]ence encroaches on only a small portion of the Bogdanoff[s]'s property that is not being used for any particular purpose." The court concluded that the hardship to RMHP upon denial of the easement "greatly outweighs the burden of the slight encroachment."

We conclude the trial court's determinations are supported by substantial evidence. The evidence showed that Martone had been investing heavily in improving the park's upkeep. The evidence further showed that Martone wanted to install a fence in early 2019 but waited until May 2020 to install it. The fence cost a substantial amount and would require considerable effort and expense to be moved. In addition, the Riverbend and Piedra properties had previously been under common ownership, and certain

structures in this area of the common boundary encroached on the Piedra property. This situation would create unique complications for RMHP should an easement for the green fence be denied.

On the other hand, having previously managed the mobile home park, the Bogdanoffs knew of the interconnected history of the Riverbend and Piedra properties. They had been aware since 2014 of the encroachments at the southern end of the boundary area. They also knew, before they bought the Piedra property, that the park had long utilized the areas adjacent to the preexisting fence, in the stretch where the green fence was located. They would further have known that the preexisting fence would have to be replaced. In addition, the Bogdanoffs did not posit that they had any plans for this part of the Piedra property. Under these circumstances, the court's determination that denial of the easement would result in greatly disproportionate hardship to RMHP is supported by substantial evidence.

### G. Conclusion

The Bogdanoffs have not shown that the trial court abused its discretion in granting an equitable easement to RMHP as to the placement of the green fence.

## III. Trial Court's Determination That RMHP Established Equitable Easement for Mobile Homes 46 and 47 Is Not an Abuse of Discretion

The trial court ruled that RMHP had "established the existence of an equitable easement for the small portion of property that is burdened by the placement of [mobile homes 46 and 47]." The Bogdanoffs challenge the court's determination. We affirm.

### A. Trial Court's Ruling Regarding Mobile Homes 46 and 47

With regard to mobile homes 46 and 47, the trial court ruled: "As for the mobile homes on spaces 46 and 47, they do not have to be removed. The evidence at trial established that the spaces are not new. They have been there for many years: prior even to the Bogdanoff[s]'s operation of the park.… It would be too great a burden and hardship to require the homes be moved for the small portion (45.2 and 23.9 feet,

37.

respectively) of the Bogdanoff property upon which they encroach. [RMHP] has established the existence of an equitable easement for the small portion of property that is burdened by the placement of the mobile homes." (Fn. omitted.)

### B.    Analysis

We conclude the trial court's findings are supported by substantial evidence and its conclusion that RMHP established an equitable easement with respect to mobile homes 46 and 47 is not an abuse of discretion.

Martone testified that upon purchasing the park, he replaced mobile home units that were dilapidated beyond repair. At the time, space 46 contained "a larger RV [that] was built [up] with permanent decking all around the home," and had "sheds that went all the way back up to the creek." Space 47 had a travel trailer in it. Martone cleared spaces 46 and 47 and bought, at significant cost, mobile homes to replace the prior structures. Spaces 46 and 47 are situated along a horseshoe-shaped road and the area behind them backs up to Wildwood Creek. A number of other mobile homes are also situated around the horseshoe.

Mell's 2020 survey showed that the mobile homes in spaces 46 and 47 were encroaching 45.2 feet and 23.9 feet, respectively, on the Piedra property north of Wildwood Creek. This area forms a small, triangular part of the Piedra property, on the northeast, that is separated from the main parcel by Wildwood Creek.

Martone testified that while he replaced certain decrepit mobile homes on the property, he did not add any new spaces or pads. He explained that spaces 46 and 47 and their pads were designed for mobile homes, with underground gas lines, gas meters, and other utility connections. A mobile home pad must extend to the perimeter of the mobile home; the home cannot be larger than the pad.

Martone replaced the structures in spaces 46 and 47 with mobile homes that were new to the property. He got these homes as part of a batch of homes from a Bay Area

development that was being "redeveloped for condos." Although the homes were free, he spent $60,000 per home to get it "set up and refurbished and ready for occupancy."

Martone also explained that these mobile homes are actually very difficult and expensive to move once installed. He added that moving mobile homes 46 and 47 again would be tantamount to destroying them because they had already been moved once. As for the cost of moving a mobile home, Martone noted that when he was removing decrepit homes from the park, he spent between $15,000 and $20,000 to move each home, not including the labor entailed in "tear[ing] down and prepar[ing] the home" for transport.

As prior operators of the mobile home park, the Bogdanoffs would reasonably have known that spaces 46 and 47 were designed for mobile homes and been aware of the dimensions of their preexisting pads. Moreover, the encroaching pads were in place before Martone purchased the Riverbend property and before the Bogdanoffs bought the Piedra property. Thus, in setting the new-to-the-property mobile homes on the preexisting pads, Martone's actions were not willful or negligent.

Given the encroaching pads were in place before the Bogdanoffs bought the Piedra property, their existence, along with the new mobile homes on them, would not appear to cause irreparable harm to the Bogdanoffs.

Furthermore, removal of these mobile homes would appear to disproportionately harm RMHP, given that only a portion of each mobile home encroaches on the Piedra property, and the encroachments are in a cut-off part of the Piedra property.

The Bogdanoffs contend that the grant of an easement for mobile homes 46 and 47 is precluded because it would result in a violation of certain mobile home setback regulations. However, the trial court noted, with respect to this contention, that the "[p]ark is in compliance and properly permitted by HCD." The court's finding is supported by substantial evidence. The trial court also noted: "Further[,] it is not clear that this issue was raised in the pleadings and is therefore not at issue."

39.

In sum, the Bogdanoffs have not shown that the trial court's grant of an equitable easement to accommodate mobile homes 46 and 47 was an abuse of discretion.

## IV. Trial Court's Determination That RMHP Established Equitable Easement for Placement of Shipping Container Is Not an Abuse of Discretion

The trial court ruled that "[a]pplying the 'relative hardship doctrine[,]' the [shipping] container should not be moved." The court concluded, "there is an equitable easement for placement of the shipping container."

The Bogdanoffs argue, in passing, that the "shipping container must also be moved." This is the sum total of their argument challenging the trial court's grant of an equitable easement to RMHP for the shipping container. In light of their undeveloped argument, the Bogdanoffs have forfeited any challenge to the court's ruling as to the shipping container.

In any event, the trial court's findings as to the shipping container are supported by substantial evidence and its grant of an equitable easement for the shipping container is not an abuse of discretion.

As to the shipping container, part of which encroaches 24.3 feet on the Piedra property, the trial court stated: "The Bogdanoffs have been aware of the shipping container for at least 10 years and have delayed significantly in asking for its removal. There is no evidence that the container was placed in bad faith. Finally, contrary to the Bogdanoff[s]'s assertion, the shipping container is not easily moved. It has underground electric and water connections. The Bogdanoff[s] purchased the land in 2018 with clear notice of this encroachment and did nothing to seek its removal for many years. The container can remain."

The trial court's findings as to the shipping container are amply supported by substantial evidence. Martone testified that the container had been located in the same spot for 30-plus years. It is electrified and has running water, which utilities are supplied through underground wires and pipes. It serves the park's storage needs. John

40.

Bogdanoff himself utilized the container when he managed the park. We conclude the Bogdanoffs have not shown the court's determination that RMHP has established an equitable easement for the shipping container is an abuse of discretion.

**V.      Trial Court's Determination that RMHP Established an Equitable Easement for Mobile Homes 7, 8, and 9 is not an Abuse of Discretion**

The trial court granted an equitable easement to RMHP for mobile homes 7, 8, and 9, each of which marginally encroached on the Piedra property. The court ruled:

> "The Bogdanoff[s] seek relocation of three occupied mobile homes. Space 7 encroaches seven feet onto the [Piedra property], Space 8 encroaches 7.8 feet onto the [Piedra property] and Space 9 encroaches [0].5 feet onto the [Piedra property]. [T]here is an implied and equitable easement for the *de minimus* loss of use of the property by the Bogdanoffs. On balance of the hardships, there is no basis to order removal of the mobile homes. The Bogdanoffs had notice of the location of those homes when they entered into a lease agreement to purchase the [Riverbend] property on May 2, 2014. They may not have known at that time that the homes were encroaching, but they were certainly on notice of the location of the homes and could have had a survey done before entering into a contract to purchase the [p]ark and later[,] prior to purchasing the adjoining land. The homes have been located on those spaces since at least 2006. It would be inequitable to order their removal."

The Bogdanoffs challenge the trial court's ruling as to mobile homes 7, 8, and 9. We affirm.

The evidence shows the Bogdanoffs were specifically informed, in 2014, that mobile homes 7, 8, and 9 encroached on the Piedra property. Moreover, mobile home 7 had the same tenants for the last 15 years, and mobile home 9 was a tenant-owned home that had been in place for 30 years. Under these circumstances, the trial court's

determination that RMHP was entitled to an equitable easement for mobile homes 7, 8, and 9 was not an abuse of discretion.[22]

## VI. Trial Court Determined That RMHP Established Implied Easement as to Use of Access Road; Bogdanoffs Have Forfeited Any Challenge to Court's Determination

The trial court determined that RMHP had established an implied easement as to the use of the access road. A trial court's determination as to an implied easement is reviewed for substantial evidence. (*Romero v. Shih* (2024) 15 Cal.5th 680, 688.)

### A. Trial Court's Ruling

The trial court ruled:

> "An easement by implication occurs when: (1) the owner of property conveys or transfers a portion of property to another[;] (2) the owner's prior existing use of the property was of such a nature that the parties must have intended or believed that the use would continue, meaning the existing use must either have been known to the grantor or grantee, or have been so obvious and apparently permanent that the parties should have known of the use; and (3) the easement is reasonably necessary to the use and benefit of the quasi dominant tenement. (*Tusher v. Gabrielson* (1998) 68 Cal.App.4th 131, 141.)

> "1. The Access Road

> "The evidence at trial established that the [a]ccess [r]oad runs from the RMHP office through the [Piedra property] to Piedra Road. The [a]ccess [r]oad was visible and its use obvious to all; testimony at trial established that the [r]oad had been used since at least the early 2000s. In 2003, both the [p]ark and the [Piedra property] were owned and operated by one entity. Mr. Bogdanoff admitted at trial, to the existence of the [a]ccess [r]oad and its use by [p]ark residents, guests, employees and himself, during the time he managed the [p]ark in 2014 and prior to his purchase of the adjoining property in 2018.

---

[22]    In light of our conclusion that the trial court properly granted equitable easements as to mobile homes 7, 8, and 9, we need not address the court's determination that RMHP was entitled to an implied easement for these homes as well.

"Mr. Martone and the managing member of his predecessor-in-interest, Isabel Rodriguez, also testified to the [a]ccess [r]oad's existence and use. Mr. Martone testified that he used the [a]ccess [r]oad and saw residents and guests use it during his inspection prior to his purchase and through 2018, when he testified it was barricaded by Bogdanoff. Further, as the former operator of the [p]ark, the Bogdanoffs were obviously aware of the [a]ccess [r]oad and the fact that i[t] was used by residents (as well as Bogdanoff himself). Thus, the Bogdanoffs had actual knowledge of the [a]ccess [r]oad's use at the time they purchased the [Piedra property]. The [a]ccess [r]oad is reasonably necessary for the use and benefit of the RM[HP p]roperty, as was testified to by Mr. Martone and Mr. Fry. The [r]oad is needed for access during flooding and is part of the required Emergency Preparedness Plan, filed with HCD. Therefore RMHP has met its burden to establish an implied easement for continued use of the [a]ccess [r]oad." (Fn. omitted.)

### B.     Bogdanoffs Have Forfeited Any Challenge to Trial Court's Ruling

The Bogdanoffs argue the trial court erroneously granted RMHP "a prescriptive easement" for use of the access road. Their argument is unavailing because the court did not grant RMHP a prescriptive easement for use of the access road. The Bogdanoffs's argument is not adequately developed in any event.

With respect to the trial court's determination that RMHP had established an implied easement for use of the access road by the park, the Bogdanoffs simply state, "[t]here is no implied easement."

We conclude the Bogdanoffs have not shown the trial court's determination was erroneous. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [orders and judgments are presumed correct, and the appellant must affirmatively show error].) Rather, they have forfeited any challenge to the trial court's determination that RMHP has an implied easement for use of the access road. (*Cahill v. San Diego Gas & Electric Co*. (2011) 194 Cal.App.4th 939, 956 [" 'Appellate briefs must provide argument and legal authority for the positions taken. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' "].)

**VII.  Gravel Piles**

Finally, the Bogdanoffs make another bare bones argument; they state they "believe that the heavy equipment such as tractors, backhoes and dump trucks, and gravel and dirt piles that belong[] to RMHP, LLC must be removed from our property."  This argument is not adequately developed, and we need not consider it.  (See, e.g., *Singh v. Lipworth* (2014) 227 Cal.App.4th 813, 817 ["We consider all points asserted in this appeal to be forfeited as unsupported by 'adequate factual or legal analysis.' "].)

We have addressed above all arguments raised by the Bogdanoffs in the "Argument" section of their opening brief.  To the extent the Bogdanoffs raise new arguments for the first time in their reply brief, we decline to consider them.  (*Champir, LLC v. Fairbanks Ranch Assn.* (2021) 66 Cal.App.5th 583, 591, fn. 3 [" 'Normally, a contention may not be raised for the first time in a reply brief.' "].)

## DISPOSITION

The judgment is affirmed.  RMHP is awarded its costs on appeal.


DESANTOS, J.

WE CONCUR:


HILL, P. J.


MEEHAN, J.